UNITED STATES *v.* LOUISIANA ET AL.
(LOUISIANA BOUNDARY CASE).

No. 9, Orig.—Argued October 14–15, 1968.—Decided March 3, 1969.

12

14

*Victor A. Sachse* and *J. B. Miller,* Special Assistant Attorneys General of Louisiana, argued the State of Louisiana's motion for entry of supplemental decree. With them on the briefs were *Jack P. F. Gremillion,* Attorney General, *Paul M. Hebert, Thomas W. Leigh, Robert F. Kennon, W. Scott Wilkinson, J. J. Davidson, Oliver P. Stockwell, Frederick W. Ellis,* and *Anthony J. Correro III,* Special Assistant Attorneys General, and *John L. Madden,* Assistant Attorney General.

*Archibald Cox* argued for the United States on cross-motion for supplemental decree as to the State of Louisiana. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Martz, Louis F. Claiborne, Roger P. Marquis,* and *George S. Swarth.*

MR. JUSTICE STEWART delivered the opinion of the Court.

In *United States* v. *Louisiana,* 363 U. S. 1, the Court held that by the Submerged Lands Act of 1953[1] the United States had quitclaimed to Louisiana the lands underlying the Gulf of Mexico within three geographical miles of the coastline.[2] The United States was declared

---

[1] 67 Stat. 29, 43 U. S. C. §§ 1301–1315.

[2] The Submerged Lands Act was enacted in response to the Court's decisions in *United States* v. *California,* 332 U. S. 19,

entitled to the lands further seaward. In the decree, as in the Submerged Lands Act, "coast line" was defined as "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters." [3] We reserved jurisdiction "to entertain such further proceedings, enter such orders and issue such writs as may . . . be deemed necessary or advisable to give proper force and effect to this decree." [4] Before the Court now are cross-motions by the United States and Louisiana [5] for a supplemental decree designating the boundary of the lands under the Gulf owned by Louisiana.[6] The segments of that boundary line that

_United States_ v. _Texas,_ 339 U. S. 707, and _United States_ v. _Louisiana,_ 339 U. S. 699, that the States did not own the submerged lands off their coasts and that the United States had paramount rights in such lands. After enactment of the Submerged Lands Act, the United States commenced this action against Louisiana, invoking our original jurisdiction under Art. III, § 2, of the Constitution, and seeking a declaration that it was entitled to exclusive possession of and power over the lands underlying the Gulf of Mexico more than three geographical miles from the coast.

[3] 364 U. S. 502, 503; 43 U. S. C. § 1301 (c).

[4] 364 U. S., at 504.

[5] By order of the Court, the United States' original suit against Louisiana was broadened to include the other Gulf States as defendants. 354 U. S. 515. In connection with the supplemental decrees now proposed by the United States and Louisiana, Texas and Mississippi have filed motions seeking an order eliminating from consideration any issue with respect to the lateral boundaries between Louisiana and those States. While we have found it unnecessary to enter any such formal order, it is evident that the decree which will be entered at this stage of the case will decide only the rights of Louisiana and the United States and will not affect any lateral boundaries between the States.

[6] A supplemental decree was entered in 1965 with the consent of the parties removing several large areas from dispute. The decree also directed an accounting and distribution of funds collected from

lie three miles outward from "that portion of the coast which is in direct contact with the open sea" are for the most part easily determinable. The controversy here is primarily over the location of that part of the coastline that consists of "the line marking the seaward limit of inland waters."

More than three years ago, in *United States* v. *California,* 381 U. S. 139, we held that Congress had left to the Court the task of defining "inland waters," and we adopted for purposes of the Submerged Lands Act the definitions contained in the international Convention on the Territorial Sea and the Contiguous Zone, ratified by the United States in 1961.[7] The United States asserts that the same definitions should determine the location of the "line marking the seaward limit of inland waters" of Louisiana. Louisiana, on the other hand, contends that this line has already been determined pursuant to an 1895 Act of Congress which directed the drawing of "lines dividing the high seas from rivers, harbors and

those areas under the 1956 Interim Agreement between the parties governing the administration of disputed areas. 382 U. S. 288.

[7] [1964] 15 U. S. T. (pt. 2) 1607, T. I. A. S. No. 5639. The Convention was the culmination of long years of work by the International Law Commission. Established by the United Nations General Assembly in 1947 to codify international law, the Commission began deliberations on the regime of the territorial sea in 1952 on the basis of a report submitted by the special rapporteur. At its eighth session in 1956 the Commission adopted a final report, which contained a proposed international convention and recommended the convocation of an international conference to examine further the law of the sea. The General Assembly adopted that recommendation and in 1958 convened the First U. N. Conference on the Law of the Sea in Geneva. With the International Law Commission report as its model, the Conference promulgated the Convention on the Territorial Sea and the Contiguous Zone and three other conventions dealing with other problems of international maritime law. See 1 A. Shalowitz, Shore and Sea Boundaries 203–211 (1962).

inland waters," and has proposed a decree based upon this contention. Alternatively, Louisiana argues that, even assuming the applicability of the definitions contained in the Convention on the Territorial Sea and the Contiguous Zone, the decree proposed by the United States reflects too restrictive a construction of the Convention's provisions in derogation of relevant principles of international law.

## I.

### THE "INLAND WATER LINE."

Comprehensive congressional regulation of maritime navigation began with the Act of April 29, 1864,[8] which promulgated rules applicable to all vessels of domestic registry on any waters. These rules were patterned on emerging international standards, and when most other maritime nations subsequently changed their rules, the United States Congress in 1885 enacted conforming "Revised International Rules and Regulations" to govern American ships "upon the high seas and in all coast waters of the United States, except such as are otherwise provided for." [9] The 1864 Act was therefore repealed except as to navigation "within the harbors, lakes, and inland waters of the United States." [10] In 1889 the International Maritime Conference drafted new International Rules, which were promptly adopted by Congress.[11] Article 30 of those rules provided that "[n]othing in these rules shall interfere with the operation of a special rule, duly made by local authority, relative to the navigation of any harbor, river, or inland waters." [12]

---

[8] 13 Stat. 58, codified as R. S. § 4233.
[9] Act of March 3, 1885, 23 Stat. 438.
[10] 23 Stat. 442.
[11] Act of August 19, 1890, 26 Stat. 320.
[12] 26 Stat. 328.

The United States already had in the 1864 Act such special inland rules for ships of American registry. In order to clarify the areas and ships to which the International and Inland Rules would respectively apply,[13] Congress in 1895 provided that the rules of the 1864 Act were to govern the navigation of *all* vessels "on the harbors, rivers and inland waters of the United States."[14] The 1895 Act went on to provide:

> "The Secretary of the Treasury is hereby authorized, empowered and directed from time to time to designate and define by suitable bearings or ranges with light houses, light vessels, buoys or coast objects, the lines dividing the high seas from rivers, harbors and inland waters."

The authority thus vested in the Secretary of the Treasury has since been transferred several times to various federal officials and now resides with the Commandant of the Coast Guard;[15] and from time to time the lines authorized by the 1895 Act have been designated along portions of the United States coast. When the Submerged Lands Act was passed in 1953, such lines had been drawn in the Gulf only along some segments of the

---

[13] The Inland Rules are now codified at 33 U. S. C. §§ 152–232 and the International Rules at 33 U. S. C. §§ 1051–1094.

[14] Act of February 19, 1895, 28 Stat. 672.

[15] The authority given to the Secretary of the Treasury in the 1895 Act was successively transferred: (1) to the Secretary of Commerce and Labor (Act of February 14, 1903, 32 Stat. 829), later redesignated "Secretary of Commerce" (Act of March 4, 1913, 37 Stat. 736); (2) to the Commandant of the Coast Guard (Reorganization Plan No. 3 of 1946, 60 Stat. 1097); (3) to the Secretary of the Treasury (or to the Secretary of the Navy when the Coast Guard is operating in that department (Reorganization Plan No. 26 of 1950, 64 Stat. 1280)), and delegated by the Secretary of the Treasury to the Commandant of the Coast Guard (Treasury Department Order of July 31, 1950, 15 Fed. Reg. 6521). Section 6 (b)(1) of the

Louisiana shore,[16] but in that year the Commandant of the Coast Guard drew new lines applicable to all the waters off the Louisiana coast.[17] In 1954 the Louisiana Legislature declared that it "accepted and approved" this demarcation, which it now calls the "Inland Water Line," as its boundary.[18] Louisiana now argues that this line encloses inland waters and is therefore "the line marking the seaward limit of inland waters," and thus its "coastline" within the meaning of the Submerged Lands Act.[19]

Louisiana argues initially that the 1895 Act is *in pari materia* with the Submerged Lands Act. Congress, it is said, must have contemplated that a technical term such as "inland waters" should have the same meaning in different statutes. The phrase appears, however, in quite different contexts in the two pieces of legislation. While the Submerged Lands Act established boundaries between the lands of the States and the Nation, Congress' only concern in the 1895 Act was with the problem of navigation in waters close to this Nation's shores. There is no evidence in the legislative history that it was the purpose of Congress in 1953 to tie the meaning of the phrase "inland waters" to the 1895 statute. For

---

Department of Transportation Act, 80 Stat. 938, transferred this authority to the Secretary of Transportation, effective April 1, 1967 (Exec. Order No. 11340, March 30, 1967, 32 Fed. Reg. 5453); it was again delegated to the Commandant of the Coast Guard, effective April 1, 1967 (49 CFR § 1.4 (a)(2), 32 Fed. Reg. 5606).

[16] 12 Fed. Reg. 8458, 8460 (1947).

[17] 18 Fed. Reg. 7893 (1953).

[18] Louisiana Act No. 33 of 1954. The "Inland Water Line" is delineated on the map of the Louisiana coast appended to this opinion, following p. 78.

[19] In *United States* v. *California,* 381 U. S. 139, neither party suggested to the Court that the "Inland Water Line" had any relevance to the Submerged Lands Act. Indeed, both specifically disclaimed any reliance on it.

20

instance, during the Senate Committee hearings on the Submerged Lands Act, the following exchange took place between Senator Anderson and the Assistant Attorney General of Louisiana:

"Senator ANDERSON. Was there not a so-called Government line drawn along the coast of Louisiana?

"Mr. MADDEN. Only a partial line, Senator. I remember the old statute that authorized, I believe it was first the Secretary of Commerce, or the Treasury, to fix a line to show the demarcation between inland waters and the high seas. I think the Coast Guard has attempted to draw a partial line over on the east side of Louisiana.

"Senator ANDERSON. We went through all that in the hearing a couple of years ago, and found that was of no value to us whatsoever." [20]

Louisiana's position that the Submerged Lands Act must necessarily be read as referring to the 1895 Act is thus not tenable.[21] After a lengthy review of the legislative

---

[20] Hearings on S. J. Res. No. 13 and other bills before the Senate Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 276 (1953). In hearings on proposed submerged lands legislation in earlier Congresses, representatives of Louisiana had argued to Congress that the Administration bills were "in error" because they overlooked the fact that, by the "Inland Water Line," "the inland waters of coastal States have already been defined and divided." Hearings on S. 155 and other bills before the Senate Committee on Interior and Insular Affairs, 81st Cong., 1st Sess., 194 (1949). See also id., at 179–180; Hearings on H. R. 5991 and H. R. 5992 before Subcommittee No. 1 of the House Committee on the Judiciary, 81st Cong., 1st Sess., 74–75 (1949).

[21] Also without substance is Louisiana's claim that the United States cannot alter the boundary adopted by Louisiana in 1954. The question before us is the location of the boundary of land quitclaimed to Louisiana by the United States in 1953, and that question is of course not affected by any subsequent action of the Louisiana

history of the Submerged Lands Act in *United States* v. *California,* we reached the conclusion that Congress deliberately "chose to leave the definition of inland waters where it found it—in the Court's hands." 381 U. S., at 157. We adhere to that view, and turn to Louisiana's other arguments in support of the "Inland Water Line."

We further decided in *United States* v. *California* that the provisions of the Convention on the Territorial Sea and the Contiguous Zone were "the best and most workable definitions available," 381 U. S., at 165, and we adopted them for purposes of the Submerged Lands Act. Yet Louisiana asserts that the Court is not precluded by the *California* decision from adopting the "Inland Water Line" in this case. Essentially the argument is that the Convention was not intended either to be the exclusive determinant of inland or territorial waters or to divest a nation of waters which it had long considered subject to its sole jurisdiction. By the long-standing, continuous, and unopposed exercise of jurisdiction to regulate navigation on waters within the "Inland Water Line," the United States is said to have established them as its inland waters under traditional principles of international law. Alternatively, Louisiana suggests that, even assuming the exclusivity of the Convention on the Territorial Sea and the Contiguous Zone, the "Inland Water Line," by virtue of this assertion of sovereignty, has created "historic bays" within the exception of

Legislature. As we stated in an earlier dispute between these parties, "[w]e intimate no opinion on the power of a State to extend, define, or establish its external territorial limits or on the consequences of any such extension *vis à vis* persons other than the United States or those acting on behalf of or pursuant to its authority. The matter of state boundaries has no bearing on the present problem." *United States* v. *Louisiana,* 339 U. S. 699, 705.

Article 7 of the Convention.[22]    We have concluded, how-
ever, that nothing in either the enactment of the 1895
Act or its administration indicates that the United
States has ever treated that line as a territorial boundary.

Under generally accepted principles of international
law, the navigable sea is divided into three zones, dis-
tinguished by the nature of the control which the con-
tiguous nation can exercise over them.[23]    Nearest to
the nation's shores are its inland, or internal waters.
These are subject to the complete sovereignty of the
nation, as much as if they were a part of its land terri-
tory, and the coastal nation has the privilege even to
exclude foreign vessels altogether.    Beyond the inland
waters, and measured from their seaward edge, is a belt
known as the marginal, or territorial, sea.[24]    Within it the
coastal nation may exercise extensive control but cannot
deny the right of innocent passage to foreign nations.[25]

---

[22] Article 7 sets forth precise mathematical requirements which
bays must satisfy to qualify as inland waters from whose seaward
edge the territorial sea extends.    See *infra*, at 48; n. 64, at 49; 52,
n. 68; 54–55.    Paragraph 6 of the Article provides, however, that
"[t]he foregoing provisions shall not apply to so-called 'historic'
bays . . . ."

[23] On the threefold division of the sea, see generally L. Bouchez,
The Regime of Bays In International Law 4–5 (1964); 1 Shalowitz,
*supra*, n. 7, at 22–24; M. Strohl, The International Law of Bays
3–4 (1963).

[24] The breadth of the territorial sea varies from country to
country, depending on the claims of the coastal state.    These claims
have long been so diverse that the Geneva Conference was unable
to agree upon a uniform distance for purposes of the Convention on
the Territorial Sea and the Contiguous Zone.    A table illustrating
the various territorial sea claims of most nations appears at 1 Shalo-
witz, *supra*, n. 7, at 389 (App. J.).

[25] Article 14 of the Convention on the Territorial Sea and the
Contiguous Zone provides that "ships of all States, whether coastal
or not, shall enjoy the right of innocent passage through the terri-
torial sea."

Outside the territorial sea are the high seas, which are international waters not subject to the dominion of any single nation.[26]

Whether particular waters are inland has depended on historical as well as geographical factors. Certain shoreline configurations have been deemed to confine bodies of water, such as bays, which are necessarily inland. But it has also been recognized that other areas of water closely connected to the shore, although they do not meet any precise geographical test, may have achieved the status of inland waters by the manner in which they have been treated by the coastal nation. As we said in *United States* v. *California,* it is generally agreed that historic title can be claimed only when the "coastal nation has traditionally asserted and maintained dominion with the acquiescence of foreign nations." 381 U. S., at 172.[27]

---

[26] Article 2 of the Convention on the High Seas provides: "The high seas being open to all nations, no State may validly purport to subject any part of them to its sovereignty." [1962] 13 U. S. T. (pt. 2) 2313, T. I. A. S. No. 5200. It has, however, generally been thought that the coastal nation can exercise some limited jurisdiction over ships beyond its territorial waters. See, *e. g.,* M. McDougal & W. Burke, The Public Order of the Oceans, c. 6 (1962); P. Jessup, The Law of Territorial Waters and Maritime Jurisdiction 75–112 (1927); 1 Shalowitz, *supra,* n. 7, at 27. The Convention on the Territorial Sea and the Contiguous Zone has recognized that such extensions of jurisdiction are sometimes imperative and has provided that in a contiguous zone not to exceed 12 miles from the coast, the littoral nation "may exercise the control necessary to: (a) Prevent infringement of its customs, fiscal, immigration or sanitary regulations within its territory or territorial sea; (b) Punish infringement of the above regulations committed within its territory or territorial sea." Article 24.

[27] A recent United Nations study recommended by the International Law Commission reached the following conclusions:

"There seems to be fairly general agreement that at least three factors have to be taken into consideration in determining whether a State has acquired a historic title to a maritime area. These factors are: (1) the exercise of authority over the area by the

24

While there is not complete accord on the definition of historic inland waters,[28] it is universally agreed that the reasonable regulation of navigation is not alone a sufficient exercise of dominion to constitute a claim to historic inland waters. On the contrary, control of navigation has long been recognized as an incident of the coastal nation's jurisdiction over the territorial sea. Article 17 of the Convention on the Territorial Sea and the Contiguous Zone embodies this principle in its declaration that "[f]oreign ships exercising the right of innocent passage [in the territorial sea] shall comply with the laws and regulations enacted by the coastal State . . . and, in particular, with such laws and regulations relating to transport and navigation." [29]

---

State claiming the historic right; (2) the continuity of this exercise of authority; (3) the attitude of foreign States. First, the State must exercise authority over the area in question in order to acquire a historic title to it. Secondly, such exercise of authority must have continued for a considerable time; indeed it must have developed into a usage. More controversial is the third factor, the position which the foreign States may have taken towards this exercise of authority. Some writers assert that the acquiescence of other States is required for the emergence of an historic title; others think that absence of opposition by these States is sufficient." Juridical Regime of Historic Waters, Including Historic Bays, [1962] 2 Y. B. Int'l L. Comm'n 1, 13, U. N. Doc. A/CN.4/143 (1962).
See also Bouchez, *supra*, n. 23, at 203, 281.

[28] Historic title can be obtained over territorial as well as inland waters, depending on the kind of jurisdiction exercised over the area. "If the claimant State exercised sovereignty as over internal waters, the area claimed would be internal waters, and if the sovereignty exercised was sovereignty as over the territorial sea, the area would be territorial sea." Juridical Regime of Historic Waters, Including Historic Bays, *supra*, n. 27, at 23.

[29] Modern authorities are unanimous on this principle. Thus, Jessup states that "[i]t seems clear that even transient vessels must obey reasonable rules and regulations laid down by the littoral state in the interests of safety of navigation and maritime police." And

Because it is an accepted regulation of the territorial sea itself, enforcement of navigation rules by the coastal nation could not constitute a claim to inland waters

he cites the United States Inland Rules as an example of such regulation of the territorial sea. Jessup, *supra*, n. 26, at 121, 122, n. 37. Shalowitz also concludes that the right of innocent passage through the territorial sea "may be conditioned upon the observance of special regulations laid down by the coastal nation for the protection of navigation . . . and other local interests." 1 Shalowitz, *supra*, n. 7, at 23. See also Boggs, Delimitation of the Territorial Sea, 24 Am. J. Int'l L. 541, 542 (1930); 3 G. Gidel, Le Droit International Public de la Mer 633 (1934); Strohl, *supra*, n. 23, at 273, 275.

J. Griffin, The American Law of Collision (1949) is said by Louisiana to be to the contrary. Referring to the "Inland Water Line," the author states that "[t]he Inland Rules apply to vessels of any nationality, since the United States has full jurisdiction over the waters in question." *Id.*, at 11–12. It is clear, however, that the jurisdiction to which the author refers is not the total sovereignty of a coastal nation over its inland waters, but rather the control of the territorial sea. Thus, he notes earlier that the Inland Rules govern "cases arising on *coastal and inland* waters of the United States which are subject to *admiralty jurisdiction.*" *Id.*, at 8. (Emphasis supplied.)

This international understanding is not a recent development. At the time Congress enacted the Inland and International Rules, there was also no dispute about a coastal nation's power to regulate navigation in its territorial sea. At the 1895 meeting of the International Law Association, Rules Relating to the Territorial Sea were adopted. A six-mile territorial sea was agreed upon, in which all nations would have the right of innocent passage. Article 7 then provided:

"Ships which pass through territorial waters shall conform to the special regulations decreed by the littoral State in the interest and for the security of navigation or as matter of maritime police."

Report of the Seventeenth Conference of the International Law Association held in Brussels, October 1895 (1896), excerpted in H. Crocker, Extent of the Marginal Sea 178 (1919). An identical article had been approved in 1894 by the Institute of International Law at Paris. *Id.*, at 149. And individual authors of the day often

26

from whose seaward border the territorial sea is measured.[30]

But even if a nation could base a claim to historic inland waters on its continuous regulation of naviga-

---

expressed this principle. See the following works excerpted in Crocker: Bluntschli, Le Droit International Codifié (5th ed. 1895), in Crocker, at 10; Calvo, Le Droit International Théorique et Pratique (5th ed. 1896), in Crocker, at 33; Fiore, International Law Codified and Its Legal Sanction, or The Legal Organization of the Society of States (1918), in Crocker, at 58; Latour, La Mer Territoriale au Point de Vue Théorique et Pratique (1889), in Crocker, at 237–238; Von Liszt, Das Völkerrecht (5th ed. 1907), in Crocker, at 293; Nuger, Des Droits de l'État sur la Mer Territoriale (1887), in Crocker, at 304; Perels, Manuel de Droit Maritime International (1884), in Crocker, at 352–353; Schücking, Das Küstenmeer im Internationalen Rechte (1897), in Crocker, at 436–437.

The 1930 Conference at The Hague also had no doubt of the power of the coastal nation to regulate navigation in the territorial sea. Article 6 of its proposed codification stated:

"Foreign vessels exercising the right of passage shall comply with the laws and regulations enacted in conformity with international usage by the coastal State, and, in particular, as regards:

"(a) The safety of traffic and the protection of channels and buoys . . . ."

And the commentary to this Article stated that "[i]nternational law has long recognised the right of the coastal State to enact, in the general interest of navigation, special regulations applicable to vessels exercising the right of passage through the territorial sea." 3 Acts of the Conference for the Codification of International Law, Territorial Waters 214 (1930).

[30] The recent United Nations study of the concept of historic waters concluded that "if the claimant State allowed the innocent passage of foreign ships through the waters claimed, it could not acquire an historic title to these waters as internal waters, only as territorial sea." Juridical Regime of Historic Waters, Including Historic Bays, supra, n. 27, at 23. Under that test, since the United States has not claimed the right to exclude foreign vessels from within the "Inland Water Line," that line could at most enclose historic territorial waters.

tion,[31] it is clear that no historic title can accrue when the coastal nation disclaims any territorial reach by such an exercise of jurisdiction. For at least the last 25 years, during which time Congress has twice re-enacted both the International and Inland Rules,[32] the responsible officials have consistently disclaimed any but navigational significance to the "Inland Water Line." When the line was for the first time completed off the entire Louisiana shore, the Commandant of the Coast Guard declared:

> "The establishment of descriptive lines of demarcation is solely for purposes connected with navigation and shipping. . . . These lines are not for the purpose of defining Federal or State boundaries, nor do they define or describe Federal or State jurisdiction over navigable waters." [33]

As early as 1943 the Coast Guard had differentiated the "Inland Water Line" from other boundaries with territorial significance. Its manual on Admiralty Law Enforcement, published that year, discussed the principles of international law relating to the definitions and jurisdictional attributes of inland waters, the territorial sea, and the high seas. The manual then contrasted the line drawn under the 1895 Act.

> "NAVIGATION RULE: Now let us consider another line of demarcation. As shown in Chapter V, there are different rules for navigation on the 'inland waters' and the 'high seas': the Inland Rules and the International Rules. But here we

---

[31] Cf. Bouchez, *supra*, n. 23, at 227, 249; Strohl, *supra*, n. 23, at 293.

[32] Inland Rules: Act of May 21, 1948, 62 Stat. 249; Act of August 8, 1953, 67 Stat. 497. International Rules: Act of October 11, 1951, 65 Stat. 406; Act of September 24, 1963, 77 Stat. 194.

[33] 18 Fed. Reg. 7893 (1953).

do not apply the previous definition, but adopt a new one for convenience. The Secretary of Commerce has fixed a series of lines along our coast, lines not following the natural curvature of our shores, and not following any three-mile natural perimeter, and the Inland Rules apply inside this line, while the International Rules apply outside the line. . . .

"Quite obviously, this artificial line does not truly separate the high seas from the inland waters of the United States. It simply marks the area within which the Inland Rules apply, and outside of which the International Rules control." [34]

In *United States* v. *California* we held that the United States' disclaimer to the Court of any historic title was decisive in the light of the "questionable evidence of con-

---

[34] Admiralty Law Enforcement 25–26 (1943). See also the Coast Guard Law Enforcement Manual 3–7 (1954):

"The dividing line between inland and international waters as established by the Commandant, found in 33 CFR 82, is used only for the purpose of the Rules of the Road, and the enforcement of the inland rules of the road. It has no connection with territorial waters, or high seas, or other terms denoting general jurisdiction."

The manual Selected Materials on Coast Guard Law Enforcement 4–5 (1964) is to the same effect:

"The line established by the Commandant of the Coast Guard has no significance with respect to or dependence on the line establishing the limit of the territorial waters of the United States. In some places, the line is inshore of the territorial waters of the United States while in others, the line extends well outside the territorial limits of the United States. The sole purpose of the line is to establish a division line between the application of the Inland Rules and the International Rules of the Road."

And in the Commandant's most recent proposal to change the line for the Gulf of Mexico, he observed that "[t]he existing Gulf demarcation line extends about 20 miles out into international waters, as recognized by the State Department." He noted that the proposed "relocation of the line well within territorial waters removes any question of International Law." 32 Fed. Reg. 8763 (1967).

tinuous and exclusive assertions of dominion over the disputed waters." 381 U. S., at 175. In this case, not only are there long-standing, extrajudicial disclaimers of historic title, but also the United States has never treated the "Inland Water Line" as delimiting an area within which it can exercise jurisdiction over anything but navigation.[35]

---

[35] Judicial and lay opinion have agreed on the limited significance of the "Inland Water Line." In discussing the line in *United States v. Newark Meadows Imp. Co.*, 173 F. 426, 428, Judge Hough, of the Circuit Court for the Southern District of New York, said in 1909:

"This legislation [the 1895 Act], however, was for the purpose of delimiting the inland waters of the United States, in order to inform navigators where the inland rules of navigation, as distinguished from the international rules, become applicable. It does not purport to change the boundaries of any federal district, nor enlarge the jurisdiction of any particular federal court . . . ."

Louisiana relies on the decision of this Court in *The Delaware*, 161 U. S. 459, where it was held that the Inland Rules should govern a collision in the Gedney Channel off New York Harbor. Referring to the "Inland Water Line," the Court stated that the enclosed waters were "as much a part of the inland waters of the United States *within the meaning of this act* as the harbor within the entrance." 161 U. S., at 463. (Emphasis supplied.) The italicized qualification indicates the Court's understanding of the limited import of the "Inland Water Line."

Writers who have considered the question are unanimous that the "Inland Water Line" serves only the purpose for which it was authorized. Thus, 1 Shalowitz, *supra*, n. 7, at 23, cautions that the

"physiographic concept of the limits of inland waters should not be confused with the lines established by the United States Coast Guard to separate the areas where the Inland Rules of the Road apply from those to which the International Rules apply. These lines are established for administrative purposes and have been held to have no application other than the specific purpose of determining what rules of navigation are to be followed."

Similarly, Strohl, *supra*, n. 23, at 4, n. 5, warns that

"[c]are should be exercised not to confuse the term 'internal waters' in the context of [international territorial law] with the term 'inland

There is no indication that in enacting the navigation rules and authorizing the designation of an "Inland Water Line" Congress believed it was also determining the Nation's territorial boundaries.[36] Indeed, it seems unlikely that Congress, if it had intended that result, would have delegated such authority to the Secretary of the Treasury, to be exercised in his discretion "from time to time" and by reference to navigational aids rather than in accordance with prevailing principles of international law. Consistently with their limited statutory purpose, the lines have always been drawn, and

waters' as used by mariners entering United States coastal waters, where in certain localities they are required to operate under what are called Inland Rules of the Road. . . . The boundary lines for 'Inland Waters' within the meaning of United States Inland Rules of the Road do not necessarily coincide with the base lines delimiting the regime of internal waters as understood in general international law."

[36] On the contrary, the titles of the Acts and statements in the legislative history illustrate that Congress' only concern was with the regulation of navigation. *E. g.,* S. Ex. Doc. No. 35, 53d Cong., 3d Sess., 2 (1895). The provision for the delineation of an "Inland Water Line" was an afterthought, added "at the request of the maritime interests of New York and Philadelphia." 27 Cong. Rec. 2059 (1895).

Louisiana argues that since Article 30 of the 1889 International Marine Conference excepted from the International Rules only special rules for "inland waters," the Conference and Congress must have believed that the power of the coastal nation extended only to those excepted areas. It is clear, however, that both the Conference and Congress recognized the already prevailing principle of international law (see *supra,* n. 29) that the coastal nation had the power to regulate navigation in the territorial sea. But they decided that it would be preferable to have standard international rules, insofar as practicable, on all navigable waters, since there were rarely well-marked lines dividing national waters from the high seas. See Protocols of Proceedings of the International Marine Conference in Washington, D. C., in 1889, S. Ex. Doc. No. 53, 51st Cong., 1st Sess., 21–22, 25, 65–66, 127–128, 579, 730 (1890); H. R. Rep. No. 731, 48th Cong., 1st Sess., 2 (1884).

frequently altered, solely with regard to contemporary navigational needs.[37] And in the only instance called to our attention in which the "Inland Water Line" was

[37] There have been, for example, several recent changes in the lines. See, e. g., 31 Fed. Reg. 4401, 10322 (1966); 32 Fed. Reg. 7127 (1967); 33 Fed. Reg. 8273 (1968). The stated purpose of one of the 1966 changes was "to bring the regulations up to date with identification of aids to navigation." 31 Fed. Reg. 4401. When the Commandant of the Coast Guard proposed the 1953 changes in the "Inland Water Line" across the Gulf coast, he noted that "[t]hese lines are based on the needs of safety in navigation." 18 Fed. Reg. 2556 (1953). And when the 1953 line was finally adopted, he stated:

"The comments, data, and views submitted which were based on reasons not directly connected with promoting safe navigation were rejected.

"The establishment of descriptive lines of demarcation is solely for purposes connected with navigation and shipping." 18 Fed. Reg. 7893 (1953).

Similarly, when the Commandant proposed changes in the line in 1967, his reason was that "[t]he present demarcation line is not easily located and therefore is not serving its purpose of informing mariners about the rules of the road applicable to their present positions." 32 Fed. Reg. 8763 (1967). The proposed modifications were withdrawn after extended hearings. The notice of withdrawal contained the following comment on some of the evidence adduced at those hearings:

"A number of comments and views submitted did not address themselves to the purpose for which the line of demarcation is authorized under 33 U. S. Code 151, but to other subjects, including State boundaries, State rights, fishing rights, etc. These comments and views were not considered as germane to the proposals under consideration and no action is taken with respect thereto." 32 Fed. Reg. 14775 (1967).

The only alleged departure from this construction of the "Inland Water Line" is one in a set of Coast Guard orders of May 20, 1925 (i. e., during the Prohibition Era), purporting to authorize law enforcement in the "territorial waters" of the United States. "Territorial waters" were defined as comprising

"all waters within a radius of three nautical miles from the 'coast' of the United States . . . and all waters inshore of the lines desig-

mentioned by the United States in its international relations, the State Department in 1929 cautioned that the "lines do not represent territorial boundaries, but are for navigational purposes." [38]  We must therefore reject Louisiana's contention that the United States has historically treated the "Inland Water Line" as the territorial boundary of its inland waters.[39]

Finally, Louisiana argues that only adoption of the current "Inland Water Line" will fulfill the "requirements of definiteness and stability which should attend any congressional grant of property rights belonging to the United States." *United States* v. *California*, 381 U. S. 139, 167.  Any line drawn by application of the rules of the Convention on the Territorial Sea and the Contiguous Zone would be ambulatory and would vary with the frequent changes in the shoreline.  This will lead, it is said, to continuing uncertainty and endless litigation concerning the location of the Louisiana coast-

---

nated and defined by the Secretary of Commerce . . . as limiting the 'inland waters' of the United States."

This definition is found in a Coast Guard manual for official use only entitled Law Enforcement at Sea relative to Smuggling 2 (1932).  While the orders do attach to the "Inland Water Line" a jurisdictional significance beyond the regulation of navigation, they do not support Louisiana's position. The orders clearly equated "inland waters" to the territorial sea.

[38] Letter from W. R. Castle, Jr., to Chargé Lundh, July 13, 1929, in 1 G. Hackworth, Digest of International Law 645 (1940).

[39] Louisiana argues that the jurisdictional significance of the "Inland Water Line" is evidenced by its adoption by Congress in several other Acts.  Officers Competency Certificates Act, 53 Stat. 1049, 46 U. S. C. § 224a (12) (a) ; Coastwise Load Line Act, 49 Stat. 888, 46 U. S. C. § 88; Act for inspection of seagoing vessels, 49 Stat. 1544, 46 U. S. C. § 367.  In all of these statutes, however, the "Inland Water Line" is adopted as the line *seaward* of which the provisions are to apply.  Consequently they do not represent an exercise of jurisdiction over inland waters.

line under the Submerged Lands Act, because the shore-line is constantly shifting as the Mississippi River and violent Gulf storms remold the soft, silt-like delta soil. This problem was not encountered on the rock-hard, comparatively straight California coast, and Louisiana contends that there is nothing in the Submerged Lands Act which requires that inland waters be given the same definition for every part of the United States coast.[40] Just as the Court was free in *United States* v. *California* to adopt the definition which best solved the problems of that case, the argument concludes, we are free in this case to adopt a different definition more suited to the peculiarities of the highly unstable Louisiana shore.

We do not, however, so broadly construe our function under the Submerged Lands Act. Our adoption in

[40] One congressional committee report in 1953 concluded that perhaps the definition of inland waters could not be uniform, particularly as to Louisiana:

"The hearings in Louisiana were particularly revealing in regard to the weight which should be given to geographical factors. The trip our subcommittee took by air over the shore and coastal area of Louisiana was highly informative on this score. There is a startling difference between the shore and coast line of Louisiana and Florida on the one hand and that of Texas and California, on the other hand. To say that these contrasting coastal areas should be treated exactly alike with reference to the definition of inland waters would ignore geographical factors that are wholly different."

Report of the House Committee on Interior and Insular Affairs, pursuant to H. R. Res. No. 676 authorizing an Investigation and Study of the Seaward Boundaries of the United States, H. R. Rep. No. 2515, 82d Cong., 2d Sess., 19 (1953). The recommendation of that study, however, was that Congress should adopt general guidelines for the definition of inland waters and then delegate the task of drawing exact boundaries to a special commission, an approach which Congress rejected in the Submerged Lands Act. The Attorney General also urged Congress to draw "[a]n actual line on a map" in defining state boundaries to avoid uncertainty and expensive litigation. Hearings on S. J. Res. No. 13, *supra*, n. 20, at 926 (1953). This approach was also rejected in the statute as enacted.

*United States* v. *California* of the definitions contained in the Convention on the Territorial Sea and the Contiguous Zone was "for purposes of the Submerged Lands Act," and not simply for the purpose of delineating the California coastline. Congress left to this Court the task of defining a term used in the Act, not of drawing state boundaries by whatever method might seem appropriate in a particular case. It would be an extraordinary principle of construction that would authorize or permit a court to give the same statute wholly different meanings in different cases, and it would require a stronger showing of congressional intent than has been made in this case to justify the assumption of such unconfined power. Finally, we note that if the inconvenience of an ambulatory coastline proves to be substantial, there is nothing in this decision which would obstruct resolution of the problems through appropriate legislation or agreement between the parties. Such legislation or agreement might, for example, freeze the coastline as of an agreed-upon date.

Even if we were free to adopt varying definitions of inland waters for different portions of the United States coast, we are not convinced that the policy in favor of a certain and stable coastline, strong as it is, would necessarily outweigh countervailing policy considerations under the Submerged Lands Act. We recognized in *California* the desirability of "a single coastline for both the administration of the Submerged Lands Act and the conduct of our future international relations." 381 U. S., at 165. The adoption of the "Inland Water Line" for Louisiana would be completely at odds with this desideratum. Moreover, adoption of a new definition of inland waters in this case would create uncertainty and encourage controversy over the coastlines of other States, unsure as to which, if either, of the two defini-

tions would be applied to them. This uncertainty might be compounded by the absence of any "Inland Water Line" around much of the United States. And we cannot assume that, in enacting the Submerged Lands Act, Congress envisioned that the ownership of potentially vast resources might thereafter be determined "from time to time" by the Coast Guard, acting solely in the interest of navigational convenience.

For these reasons, we conclude that that part of Louisiana's coastline which, under the Submerged Lands Act, consists of "the line marking the seaward limit of inland waters," is to be drawn in accordance with the definitions of the Convention on the Territorial Sea and the Contiguous Zone.

## II.

### APPLICATION OF THE CONVENTION ON THE TERRITORIAL SEA AND THE CONTIGUOUS ZONE.

Many issues divide the parties concerning the application of the provisions of the Convention on the Territorial Sea and the Contiguous Zone to the Louisiana coast. Some of these issues, which involve simply interpretation of the Convention, we have been able to decide on the basis of the materials now before us. Others, however, are primarily factual questions involving the construction and application of the Convention's provisions with respect to particularized geographical configurations. Several of these factual disputes cannot be properly resolved without evidentiary hearings, and as to others we think it would be wise at all events in this technical and unfamiliar area to have the benefit, preliminarily, of the judgment of a detached referee. Accordingly, we have decided to refer to a Special Master the task of resolving in the first instance several of the particularized disputes over the precise

boundary between the submerged Gulf lands belonging to the United States and those belonging to Louisiana.

1. *Dredged channels.* A recurring question in the application of the Convention to the Louisiana coast is whether dredged channels in the Gulf leading to inland harbors comprise inland waters.[41] In support of its contention that dredged channels, as such, are inland waters, Louisiana relies principally on Article 8 of the Convention:

> "For the purpose of delimiting the territorial sea, the outermost permanent harbour works which form an integral part of the harbour system shall be regarded as forming part of the coast."

Incontestably, Louisiana argues, the channels "form an integral part of the harbour system"; that they are "harbour works" as well should also be obvious in light of the enormous cost and effort which the United States has expended in dredging and maintaining them.

The United States argues more convincingly, however, that Article 8 applies only to raised structures. The discussions of the Article by the 1958 Geneva Conference and the International Law Commission reveal that the term "harbour works" connoted "structures" and "installations" which were "part of the land" and which in

---

[41] Eleven such dredged channels have been brought to our attention. Moving from east to west, they appear at (1) the Mississippi River-Gulf Outlet through Breton and Chandeleur Sounds, (2) and (3) South and Southwest Passes of the Mississippi River, (4) the Empire Canal, opening into "Ascension Bay" (see *infra,* at 48), just east of Bastian Bay, (5) the Barataria Bay Waterway through Barataria Bay and into "Ascension Bay," (6) Belle Pass, the arm of Bayou Lafourche just west of Bay Marchand, (7) the Houma Navigation Canal through Terrebonne Bay, (8) the Atchafalaya River Channel through Atchafalaya Bay, (9) the Freshwater Bayou Canal, (10) Calcasieu Pass, and (11) Sabine Pass.

some sense enclosed and sheltered the waters within.[42] It is not enough that the dredged channels may be an "integral part of the harbour system"; even raised structures which fit that description, such as lighthouses, are not considered "harbour works" unless they are "connected with the coast." [43]   Thus, Article 8 provides that

---

[42] A member of the International Law Commission gave the following explanation:

"The Commission's rule that jetties and piers be treated as part of the coastline [was] based on the assumption that those installations would be of such a type as to constitute a physical part of such coastline; it would indeed have been inconvenient to treat that kind of installation otherwise than in the manner advocated by the Commission." [1955] 1 Y. B. Int'l L. Comm'n 74.

See also [1956] 1 Y. B. Int'l L. Comm'n 193; [1954] 1 Y. B. Int'l L. Comm'n 88–89.

The same understanding is reflected in the discussions at the 1958 Geneva Conference:

"4. Mr. CARMONA (Venezuela) stressed that the International Law Commission had approved the text of article 8 only after the most exhaustive study.  The construction of harbour works being of vital importance not only to the coastal State but also to the ships of all nations, no doubt should be allowed to subsist regarding the status of such works.  Governments which had made heavy economic sacrifices to secure their port facilities against the elements had always acted on the assumption that the legal position was precisely as stated in the Commission's text.  In those circumstances, any interference with that text might have very serious consequences." United Nations Conference on the Law of the Sea, Official Records, Vol. III: First Committee (Territorial Sea and Contiguous Zone), Summary Records of Meetings and Annexes, U. N. Doc. A/CONF. 13/39, p. 142.

And this view comports with generally accepted definitions of the terms "harbour" and "harbour works." See, e. g., 1 Shalowitz, supra, n. 7, at 292:

"Harborworks.—Structures erected along the seacoast at inlets or rivers for protective purposes, or for enclosing sea areas adjacent to the coast to provide anchorage and shelter."

See also id., at 60, n. 65; Strohl, supra, n. 23, at 71–72.

[43] [1954] 1 Y. B. Int'l L. Comm'n 88.

"harbour works . . . shall be regarded as forming part of the *coast*" (emphasis supplied), a description which hardly fits underwater channels. As part of the "coast," the breadth of the territorial sea is measured from the harbor works' low-water lines, attributes not possessed by dredged channels.[44] We must therefore conclude that Article 8 does not establish dredged channels as inland waters.

Louisiana also contends that the legislative history of the Submerged Lands Act reveals a clear congressional purpose to include such channels as inland waters. Early versions of the bill contained a definition of the term "inland waters" for the purposes of the Act, and that

---

[44] Article 3 provides as follows:

"Except where otherwise provided in these articles, the normal baseline for measuring the breadth of the territorial sea is the low-water line along the coast as marked on large-scale charts officially recognized by the coastal State."

Louisiana argues that, in view of the proviso "[e]xcept where otherwise provided in these articles," the United States cannot maintain that a dredged channel is not a baseline just because it has no low-water line. Article 8, it is said, is one of the provisions covered by the exception in Article 3. This argument, however, founders on the language of Articles 3 and 8. The exception in Article 3 refers to methods of determining the baseline other than by the low-water mark along the coast. Article 8 does not provide such an alternative method, but merely identifies certain structures which are to be considered part of the coast.

In this regard, the United States points out that if dredged channels were really "part of the coast" within Article 8, their seawardmost extensions could also serve as headlands from which lines closing indentations could be drawn. As the International Law Commission Commentary explained, "[t]he waters of a port up to a line drawn between the outermost installations form part of the internal waters of the coastal State." [1956] 2 Y. B. Int'l L. Comm'n 270. Yet even Louisiana has recognized the inappropriateness of using the ends of such channels as headlands of bays.

definition included "channels." [45]  The definition was later deleted, but Louisiana contends that the sole purpose of the deletion was to avoid a construction of the definition which would exclude other areas from inland waters.[46]  In *United States* v. *California,* 381 U. S. 139, 150–160, we reviewed at length the pertinent legislative history and concluded that the only sure inference which could be drawn from the deletion of the definition was that Congress thought the highly technical question should be left to the courts.  We remain

---

[45] The definition was explained as follows in H. R. Rep. No. 215, 83d Cong., 1st Sess., 4 (1953):

"Section 2 (b) defines 'coastline' which is the baseline from which the State boundaries are projected seaward.  It means not only the line of ordinary low water along the coast which directly contacts the open sea but it also means the line marking the seaward limit of inland waters.

"Inland waters include all ports, estuaries, harbors, bays, channels, straits, historic bays, sounds, and also all other bodies of water which join the open sea."

[46] In opposing the definition, Senator Cordon stated:

"I would like to see general language used for general purposes, realizing always the hazards of including a few specific references and thereby excluding others, even when we seek to indicate that there are others."  Hearings on S. J. Res. No. 13, *supra,* n. 20, at 1380.

And the report of the Senate Committee on Interior and Insular Affairs on the Submerged Lands Act gave this explanation for its deletion:

"The words 'which include all estuaries, ports, harbors, bays, channels, straits, historic bays, and sounds, and all other bodies of water which join the open sea' have been deleted from the reported bill because of the committee's belief that the question of what constitutes inland waters should be left where Congress finds it. The committee is convinced that the definition neither adds nor takes away anything a State may have now in the way of a coast and the lands underneath waters behind it."  S. Rep. No. 133, 83d Cong., 1st Sess., 18 (1953).

of that view. Moreover, it is far from clear that the word "channels" in the deleted definition encompassed dredged channels in the open sea. From the context in which the word appears, it is far more likely that the definition referred only to bodies of water bordered by land.[47]

2. *The territorial sea of low-tide elevations.* Article 11 of the Convention on the Territorial Sea and the Contiguous Zone deals with the subject of low-tide elevations:

> "1. A low-tide elevation is a naturally-formed area of land which is surrounded by and above water at low-tide but submerged at high tide. Where a low-tide elevation is situated wholly or partly at a distance not exceeding the breadth of the territorial sea from the mainland or an island, the low-water line on that elevation may be used as the baseline for measuring the breadth of the territorial sea.

> "2. Where a low-tide elevation is wholly situated at a distance exceeding the breadth of the territorial sea from the mainland or an island, it has no territorial sea of its own."

The question presented by the application of this provision to the Louisiana coast is whether the territorial sea—or, for purposes of this case, the three-mile grant to Louisiana under the Submerged Lands Act—is to be measured from low-tide elevations which lie within three miles of the baseline across the mouth of a bay but more than three miles from any point on the mainland or an island.[48]

---

[47] The bill, H. R. 4198, defined inland waters as including "all estuaries, ports, harbors, bays, channels, straits, historic bays, and sounds, *and all other bodies of water which join the open sea.*" (Emphasis supplied.) The last phrase hardly describes a deepening of water already in the open sea.

[48] The low-tide elevations in question are situated near the mouth of Atchafalaya Bay. Louisiana also argues that the United States

The United States argues that the phrase "at a distance not exceeding the breadth of the territorial sea from the mainland" does not refer to the territorial sea as a *situs*. Rather it uses the width of the territorial sea only as a measurement of *distance*—a circumlocution made necessary by the failure of the 1958 Geneva Con-

has overlooked some islands within the Bay, and that low-tide elevations within three miles of those islands should be included under Article 11. The United States disputes the existence of the islands or their characterization as such. The question, being one of fact which cannot be resolved on this record, should be decided, if necessary, by the Special Master.

Another factual question which we leave to the Special Master concerns the existence of an artificially created spoil bank at Pass Tante Phine, just to the north of West Bay. Louisiana contends that it is above water at low tide, whereas the United States argues that while it used to be so exposed, it is no longer. If the United States is correct in this assertion, of course the spoil bank forms no part of the coast. The same would be true if the bank were surrounded by water at low tide, for Article 11 of the Convention provides for measuring the territorial sea only from those low-tide elevations which are "naturally-formed area[s]." However, to the extent that the spoil bank is an extension of the mainland and is uncovered at low tide, it must be taken into account in drawing the baseline under Article 3.

The United States contends that the spoil bank should be ignored because its construction was unauthorized; it was created by the Gulf Refining Co. under a 1956 permit which, it is said, authorized the dredging of a channel but not the creation of a spoil bank. Even assuming that the creation of the bank was not authorized (a question on which we express no opinion whatever), it would not follow that it does not constitute part of the coast. If the United States is concerned about such extensions of the shore, it has the means to prevent or remove them. See *United States* v. *California*, 381 U. S. 139, 177. Nor can we accept the United States' argument that a "mere spoil bank" should not be deemed part of the coast because it is not "purposeful or useful" and is likely to be "short-lived." It suffices to say that the Convention contains no such criteria.

ference to agree upon a uniform width.[49] And that distance—three miles in this case—is to be measured from the "mainland," a term which does not comprise baselines across bodies of water but is limited to the low-water mark on dry land. Louisiana, on the other hand, interprets the Article as covering all low-tide elevations situated anywhere within the territorial sea. And the drawing of baselines across the mouths of bays is an integral step in the determination of the area of the territorial sea. Moreover, Louisiana argues, the term "mainland" does include inland waters. The theory of the Convention, it is argued, reflects a long-standing principle of international law—that bays and other inland waters are practically assimilated to the dry land and treated for all legal purposes as if they were a part of it.[50]

The parties agree that Article 11 on its face is not wholly dispositive of the issue, and that the language does not preclude either construction.[51] Each party, therefore, relies on the origins of the Article and the statements of its drafters. When the provision was first proposed to the International Law Commission in 1952, it read as follows:

> "Elevations of the sea bed *situated within the territorial sea,* though only above water at low tide,

---

[49] See n. 24, *supra.*

[50] See *supra,* at 22.

[51] The United States suggests that the issue was decided in *United States* v. *California,* for the decree in that case contained this definition of "coast line":

"(a) The line of mean lower low water on the mainland, on islands, and on low-tide elevations lying wholly or partly within three geographical miles from the line of mean lower low water on the mainland or on an island . . . ." 382 U. S. 448, 449.

As the United States concedes, however, the issue now before us was not presented by the *California* case; hence, nothing in that decision controls its resolution.

are taken into consideration for the determination of the base line of the territorial sea." [52] (Emphasis supplied.)

After several amendments to the rapporteur's draft,[53] the Commission in 1954 adopted a version with substantially the same meaning:

"Drying rocks and shoals *which are wholly or partly within the territorial sea* may be taken as points of departure for delimiting the territorial sea." [54] (Emphasis supplied.)

As the discussion made clear, both drafts of the Article covered *all* low-tide elevations within the territorial sea, however measured. Moreover, the provision was thought to embody long-standing principles of international law.[55]

---

[52] Report on the Regime of the Territorial Sea 22, [1952] 2 Y. B. Int'l L. Comm'n 33, U. N. Doc. A/CN.4/53 (1952).

[53] Second Report on the Regime of the Territorial Sea 30, [1953] 2 Y. B. Int'l L. Comm'n 57, U. N. Doc. A/CN.4/61 (1953); Addendum to the Second Report on the Regime of the Territorial Sea 5–6, [1953] 2 Y. B. Int'l L. Comm'n 75, U. N. Doc. A/CN.4/61/Add. 1 (1953); Third Report on the Regime of the Territorial Sea 13, [1954] 2 Y. B. Int'l L. Comm'n 5, U. N. Doc. A/CN.4/77 (1954).

[54] Report of the International Law Commission Covering the Work of its Sixth Session, [1954] 2 Y. B. Int'l L. Comm'n 156, U. N. Doc. A/CN.4/88 (1954).

[55] The Commentary to the 1954 Commission draft stated:

"Drying rocks and shoals situated wholly or partly in the territorial sea are treated in the same way as islands. The limit of the territorial sea will accordingly make allowances for the presence of such drying rocks and will jut out to sea off the coast. Drying rocks and shoals, however, which are situated outside the territorial sea have no territorial sea of their own.

"The Commission considers that the above article expresses the international law in force." *Ibid.*

The meaning of the initial 1952 proposal to the Commission

"was that, even if an elevation of the sea bed was only uncovered at low tide, provided it was situated within the territorial sea, the

The draft encountered a serious objection, however, which led to its further amendment by the International Law Commission. If every low-tide elevation "within

limits of the territorial sea would thereby be extended further out into the high seas. That point of view corresponded with the observation by the Preparatory Committee of The Hague Conference . . . ." [1952] 1 Y. B. Int'l L. Comm'n 175.

The 1930 Conference at The Hague had adopted a similar article:

"Elevations of the sea-bed *situated within the territorial sea,* though only above water at low tide, are taken into consideration for the determination of the base-line of the territorial sea." (Emphasis supplied.) Acts of the Conference for the Codification of International Law, *supra,* n. 29, at 217 (1930).

The observations of the subcommittee reporting to The Hague Conference further reveal the long-standing acceptance of this concept:

"If an elevation of the sea-bed which is only uncovered at low tide is situated within the territorial sea off the mainland, or off an island, it is to be taken into consideration on the analogy of the North Sea Fisheries Convention of 1882 in determining the base-line of the territorial sea." *Ibid.*

The United States argues that the discussion of this issue in connection with the *Fisheries Case (United Kingdom v. Norway)*, [1951] I. C. J. 116, indicates an understanding that a low-tide elevation must be within a certain distance from land in order to have a territorial sea of its own. The opinion of the International Court of Justice discussed the contentions of the parties but found it unnecessary to decide the question because "in fact none of the drying rocks used by [Norway] as base points is more than 4 miles from permanently dry land." *Id.,* at 128. The United States relies on the following statement by the United Kingdom of its position:

"A bank or rock exposed only at low tide (low-tide elevation) is significant in regard to territorial waters only if it lies within a belt of territorial sea measured from the low-water mark of land permanently exposed . . . ." 1 Fisheries Case, I. C. J. Pleadings 75 (1951).

This statement, however, does not exclude low-tide elevations which fall within the territorial sea by virtue of closing lines across bays; and other United Kingdom submissions to the International Court of Justice more accurately reveal its position on this question:

"[W]here there is a low-tide elevation situated within 4 sea miles of permanently dry land, *or of the proper closing line of Norwegian*

the territorial sea" was to have a territorial sea of its own, then

> "a country like Holland might extend its territorial sea very considerably by advancing from one shoal to another, claiming that a shoal situated within the territorial sea of another shoal had itself a territorial sea." [56]

To avoid this undue extension of the territorial sea, the final draft of the Commission was revised to read as follows:

> "Drying rock and drying shoals which are wholly or partly within the territorial sea, *as measured from the mainland or an island,* may be taken as points of departure for measuring the extension of the territorial sea." [57]   (Emphasis supplied.)

It is clear that under the International Law Commission version of Article 11, the "territorial sea, as measured from the mainland" included those portions which extended from baselines enclosing bays. [58]   The sole pur-

---

*internal waters,* the outer limit of territorial waters may be 4 sea miles from the outer edge (at low tide) of this low-tide elevation." [1951] I. C. J., at 120.   (Emphasis supplied.)

And see the position of the United Kingdom before the International Law Commission, n. 58, *infra.*

[56] [1954] 1 Y. B. Int'l L. Comm'n 95.

[57] Report of the International Law Commission Covering the Work of its Eighth Session, [1956] 2 Y. B. Int'l L. Comm'n 270, U. N. Doc. A/CN.4/104 (1956).

[58] The United States argues that its construction of Article 11 is supported by the failure of the International Law Commission to adopt a proposal of the United Kingdom to insert after the words "territorial sea" the phrase "as measured from the low-water mark or from a baseline."   Report of the International Law Comission Covering the Work of its Seventh Session, [1955] 2 Y. B. Int'l L. Comm'n 58, U. N. Doc. A/CN.4/94 (1955).   The preference of the Commission for the phrase "as measured from the mainland" to the British terminology, however, is consistent with the view that the phrases were thought to have the same meaning.

pose of the amendment to the initial proposals was to indicate that "drying rocks and drying shoals could only be used once as points of departure for extending the territorial sea and that the process could not be repeated by leapfrogging, as it were, from one rock or shoal to another." [59]

The United States contends that by changing the language of the International Law Commission draft to its present form in the Convention, the Geneva Conference intended also to change its meaning. Precisely the opposite conclusion, however, flows from an inspection of the history of the Convention. The amendment was advanced by the United States; yet its explanation for the proposal contained not the slightest indication that any change in the basic meaning of the Article was intended.[60] Surely there would have been some discussion of the reference to the territorial sea as a measure of distance rather than as a situs had it been the purpose of the United States or the Conference to alter so significantly the meaning of prior drafts and the existing international consensus.[61] Instead, the expert to the

[59] [1956] 1 Y. B. Int'l L. Comm'n 283.

[60] See United Nations Conference on the Law of the Sea, *supra*, n. 42, at 187, 243.

[61] The United States argues that the meaning of its proposal must have been clear to all, since only three days earlier it had submitted a proposed amendment to another article, introducing the word "mainland" for the express purpose of excluding water crossings from its scope. See *id.*, at 236. But at the time of the United States proposal the word "mainland" *already* appeared in the Conference draft of Article 11 in a context which made clear that measurement of the territorial sea from bay-closing lines was not excluded. Moreover, if the United States had in fact intended its amendment to Article 11 to exclude water crossings, it seems likely that the United States would have spelled out that intention as it had done with respect to the proposal to amend the other article three days before.

Secretariat of the Conference explained "that all the proposals on article 11 corresponded entirely to the intentions of the International Law Commission."[62] We therefore conclude that low-tide elevations situated in the territorial sea as measured from bay-closing lines are part of the coastline from which the three-mile grant of the Submerged Lands Act extends.[63]

---

[62] United Nations Conference on the Law of the Sea, *supra*, n. 42, at 186–187. The expert was Mr. Francois, who had been the Special Rapporteur of the International Law Commission for the drafting of the Convention.

[63] This conclusion coincides with the views of authorities who have dealt with the subject. Thus, Sir Gerald Fitzmaurice, who was a member of the International Law Commission and the deputy-leader of the United Kingdom's delegation to the 1958 Geneva Conference, gives this explanation of Article 11:

"The Convention (Article 11, paragraph 1) permits one exception which has come to be recognised as reasonable, namely, that where a low-tide elevation is situated within what is *already* territorial sea (off a mainland coast, or off the coast of an island permanently above sea level), it can then generate some (as it were) extraterritorial sea. In such a case, the low-tide elevation theoretically has its own territorial sea; but, as the elevation is within what is already the territorial sea of the mainland, or of an island, the practical effect is simply to cause a bulge in the seaward direction of *that* territorial sea. On the other hand, if there is a further drying rock, situated—not within the original or basic territorial sea of the mainland or island—but within the extension of such territorial sea (bulge) caused by the presence of the 'inner' drying rock, then this 'outer' drying rock will not lead to any further extensions of the territorial sea; nor does an 'outer' drying rock, so situated, generate any territorial sea of its own. This rule is intended to prevent the practice known as 'leap-frogging,' which, by making use of a series of drying rocks, banks, etc., extending seawards, might result in artificial or unjustified extensions of natural territorial waters." Fitzmaurice, Some Results of the Geneva Conference on the Law of the Sea, 8 Int'l & Comp. L. Q. 73, 86–87 (1959).

And see McDougal & Burke, *supra*, n. 26, at 396; 1 Shalowitz, *supra*, n. 7, at 228.

3. *The semicircle test.* Article 7 (2) defines a bay as follows:

"For the purposes of these articles, a bay is a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast. An indentation shall not, however, be regarded as a bay unless its area is as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation."

(a) In several areas along the Louisiana coast the parties raise the problem of whether and to what extent indentations within or tributary to another indentation can be included in the area of the latter for purposes of the semicircle test. Louisiana argues that a closing line should be drawn across what it calls "Outer Vermilion Bay" from Tigre Point to Shell Keys. That body of water does not meet the semicircle test unless the area of Vermilion Bay, joined to "Outer Vermilion Bay" only by a channel between the mainland and Marsh Island, is included. Similarly, Louisiana contends that "Ascension Bay," whose headlands are said to be the jetties at Belle Pass on the west and Southwest Pass on the east, is a bay under Article 7 (2).[64] Again, however,

---

[64] The United States argues—in addition to its contention that it does not meet the semicircle test—that "Ascension Bay" is not a true bay because it is a "mere curvature of the coast" rather than a "well-marked indentation" containing "landlocked waters." If this contention is accepted, then it is of course irrelevant that "Ascension Bay" meets the semicircle test. See *infra,* at 54. Whether an indentation qualifies as a bay under the criteria of Article 7 other than the semicircle test is a factual question which should be submitted to the Special Master in the first instance.

If "Ascension Bay" does qualify under Article 7, on the other hand, it is an oversize bay, for the closing line across its mouth

its area will satisfy the semicircle test only if deemed
to include the waters of the Barataria Bay-Caminada

---

exceeds 24 miles. See n. 68, *infra*. The procedure to be followed
in such event is spelled out in Article 7 (5):

"Where the distance between the low-water marks of the natural
entrance points of a bay exceeds twenty-four miles, a straight base-
line of twenty-four miles shall be drawn within the bay in such a
manner as to enclose the maximum area of water that is possible
with a line of that length."

The straight 24-mile line selected by Louisiana runs from Cami-
nada Pass to Empire Canal, just east of Bastian Bay, and we can
see no valid objection to that line. The United States argues that
Article 7 (5) permits the drawing inside an oversize bay of only one
24-mile closing line (or perhaps several lines totaling 24 miles). Yet
Louisiana has, in addition to drawing the 24-mile line from Caminada
Pass to Empire Canal, also drawn closing lines across other indenta-
tions within "Ascension Bay," such as West Bay, which qualify
independently as inland waters. The United States' position is that
the tributary bays cannot be taken into account in computing the
area of the larger indentation for purposes of the semicircle test
but then disregarded in measuring the parts of the bay to be
enclosed by the 24-mile line. We find nothing in the Convention
or its history to support this contention. Article 7 (5) mandates
that a straight 24-mile baseline shall be drawn within an oversize
bay so as to include the greatest area of water. It does not follow
from the fact that this *additional* method of delimiting inland
waters in an oversize bay is available, that smaller bays within the
oversize bay but outside the straight 24-mile baseline lose their
status as inland waters.

If it is determined that "Ascension Bay" does not qualify as a
"well-marked indentation" containing "landlocked waters," and
that a straight baseline therefore cannot be drawn within it from
Caminada Pass to Empire Canal, the question will be presented
whether the beach erosion jetties on Grande Isle are part of the
coast within Article 8 of the Convention. See *supra*, at 36. We
hold that they are. The United States argues that Article 8 is
limited to structures which are "integral parts of the harbor system"
and that there is no harbor between Grande Isle and the jetties.
While some early discussion of the subject by the International
Law Commission tends to support the United States' position that

Bay complex, which are separated from the outer indentation by a string of islands.[65]

Louisiana argues that the area of tributary bays or other indentations must be included within that of the primary indentation. Article 7 (3) provides that "[f]or the purpose of measurement, the area of an indentation is that lying between *the low-water mark around the shore* of the indentation and a line joining the low-water marks of its natural entrance points." (Emphasis supplied.) The italicized phrase, it is said, constitutes a direction to follow the low-water line wherever it goes, including into other indentations, in drawing the perimeter of the primary bay. The general rule is well recognized, Louisiana argues, by the United States

---

these jetties are not encompassed by Article 8, see [1954] 1 Y. B. Int'l L. Comm'n 88, the Commentary to the final International Law Commission draft of Article 8 (which was identical to its present form) expressly covers artificial structures which are not closely linked to ports:

"(2) Permanent structures erected on the coast and jutting out to sea (such as jetties and *coast protective works*) *are assimilated to harbour works.*" [1956] 2 Y. B. Int'l L. Comm'n 270. (Emphasis supplied.)

Moreover, it should be noted that the beach erosion jetties are in a real sense "harbour works," for they were designed to protect Grande Isle, which in turn shelters the harbor waters of Caminada Bay and Bay des Ilettes.

[65] The problem may also arise in West Bay, where the parties disagree as to the proper closing line. In particular, the United States objects to Louisiana's choice of the tip of the jetty at Southwest Pass as the southern headland. If that point is selected, the United States argues, the bay cannot satisfy the semicircle test unless areas such as Bob Taylor's Pond, Zinzin Bay, or Riverside Bay are included in its area; and those areas are "too definitely separated from West Bay to be considered a part of it." The proper location of headlands is, of course, another factual determination which we leave to the initial scrutiny of the Master.

Department of State among others, that the area of bays within bays is included in calculating the semicircle test.[66]

The United States does not reject the notion that some indentations which would qualify independently as bays may nonetheless be considered as part of larger indentations for purposes of the semicircle test; but it denies the existence of any rule that *all* tributary waters are so includible. Article 7 (2), it emphasizes, refers to "that indentation." The inner bays can be included, therefore, only if they can reasonably be considered part of the single, outer indentation. And that cannot be said of inland waters which, like Vermilion Bay and Barataria Bay-Caminada Bay, are wholly separated from the outer body of water and linked only by narrow passages or channels.[67]

---

[66] "[T]he water of bays within bays may be included as water surface of the outer bay in determining the dimensions of any coastal indentation." Sovereignty of the Sea, United States State Department Geographic Bulletin No. 3, p. 11 (1965). See also 1 Shalowitz, *supra,* n. 7, at 219: "In the application of the semicircular rule to an indentation containing pockets, coves, or tributary waterways, the area of the whole indentation (including pockets, coves, etc.) is compared with the area of a semicircle."

[67] 1 Shalowitz, *supra,* n. 7, at 220, n. 28, contains the following suggestions:

"One difficulty that arises in including tributary waterways as part of the area of the indentation whose status is to be determined, is that the status may depend upon how far up the tributary one goes in computing the area. This may require the adoption of an additional rule limiting the width of such waterways to a fixed amount beyond which it would not be considered a part of the primary waterway. An alternative solution would be to first apply the semicircle test to the tributary waterways: if they become inland waters a closing line is drawn across them and the primary waterway is then subjected to the test; if they do not become inland waters they would then be included as part of the area of the main

For purposes of this lawsuit, we find it unnecessary to provide a complete answer to the questions posed by the parties. "Outer Vermilion Bay," if it is to qualify under the semicircle test, must include the waters of Vermilion Bay. Yet Vermilion Bay is itself a part of the much larger indentation which includes West and East Cote Blanche Bays and Atchafalaya Bay, and which opens to the sea between Marsh Island and Point au Fer. Recognition of the unitary nature of this larger indentation follows from Louisiana's insistence that the low-water mark must be followed around the entire indentation. If, as Louisiana posits, the western headland of the indentation is at Tigre Point, then a closing line across its mouth to Point au Fer far exceeds the 24-mile limit imposed by Article 7 (4).[68] It follows that "Outer Vermilion Bay" is neither itself a bay nor part of a larger bay under the Convention on the Territorial Sea and the Contiguous Zone.

We have concluded, on the other hand, that the area of "Ascension Bay" does include the Barataria Bay-Caminada Bay complex and therefore meets the semicircle test. Those inner bays are separated from the larger "Ascension Bay" only by the string of islands across their entrances.[69] If those islands are ignored, the entrance to Barataria and Caminada Bays is sufficiently

indentation for the purpose of determining its status by the semicircular rule."

See also Shalowitz, Boundary Problems Raised by the Submerged Lands Act, 54 Col. L. Rev. 1021, 1033, n. 33 (1954). And see Bouchez, *supra,* n. 23, at 21, emphasizing the need to distinguish between bays and inland seas.

[68] Article 7 (4) reads as follows:

"If the distance between the low-water marks of the natural entrance points of a bay does not exceed twenty-four miles, a closing line may be drawn between these two low-water marks, and the waters enclosed thereby shall be considered as internal waters."

[69] See n. 79, *infra.*

wide that those bays and "Ascension Bay" can reasonably be deemed a single large indentation even under the United States' approach.[70] Article 7 (3) provides that for the purposes of calculating the semicircle test, "[i]slands within an indentation shall be included as if they were part of the water areas of the indentation." The clear purpose of the Convention is not to permit islands to defeat the semicircle test by consuming areas of the indentation. We think it consistent with that purpose that islands should not be permitted to defeat the semicircle test by sealing off one part of the indentation from the rest. Treating the string of islands "as if they were part of the water areas" of the single large indentation within which they lie, "Ascension Bay" does meet the semicircle test.[71]

(b) Another issue involving the semicircle test arises in East Bay in the Mississippi River Delta.[72] Since East Bay does not meet the semicircle test on a closing line between its seawardmost headlands—the tip of the jetty at Southwest Pass and the southern end of South Pass—it does not qualify as a bay under Article 7 of the Convention on the Territorial Sea and the Contiguous Zone. There is a line which can be drawn within East

---

[70] The United States does not agree with Shalowitz' alternative suggestion that in determining the area of a large indentation, the areas of all qualifying bays within it should be excluded. See *supra,* at 51 and n. 67.

[71] We think the same result follows in West Bay, where the areas which the United States seeks to exclude from the bay are set off only by strings of islands. See n. 65, *supra.* Accordingly, should the closing line urged by Louisiana be accepted, it will not be defeated by the semicircle test.

[72] Louisiana contends that the entire area of East Bay is a historic bay. See *infra,* at 74. If that position is accepted, of course, none of the geographic tests of Article 7 will be applicable, for Article 7 provides that "[t]he foregoing provisions shall not apply to so-called 'historic' bays . . . ."

Bay, however, so as to satisfy the semicircle test. Louisiana argues that, just as under Article 7 (5) a 24-mile line can be drawn within a bay whose mouth is more than 24 miles wide,[73] so also can a line which satisfies the semicircle test be drawn within a bay whose mouth is too wide to meet that test.

The analogy is unsound. A bay whose mouth is wider than 24 miles is nevertheless a bay. But an indentation that does not meet the semicircle test is not a bay but open sea. If an indentation which satisfies the semicircle test is a true bay, therefore, it cannot be on the theory that the closing line carves out a portion of a larger bay. The enclosed indentation must by its own features qualify as a bay.

The United States argues that the area within East Bay enclosed by Louisiana's proposed line does not constitute a bay because there is no "well-marked indentation" with identifiable headlands which encloses "landlocked" waters. Indeed, it is said, there is not the slightest curvature of the coast at either asserted entrance point. We do not now decide whether the designated portion of East Bay meets these criteria, but hold only that they must be met. We cannot accept Louisiana's argument that an indentation which satisfies the semicircle test *ipso facto* qualifies as a bay under the Convention. Such a construction would fly in the face of Article 7 (2), which plainly treats the semicircle test as a minimum requirement. And we have found nothing in the history of the Convention which would support so awkward a construction.

4. *Islands at the mouth of a bay.* Article 7 (3) of the Convention on the Territorial Sea and the Contiguous Zone provides:

> "For the purpose of measurement, the area of an indentation is that lying between the low-water

---

[73] See n. 64, *supra.*

mark around the shore of the indentation and a line joining the low-water marks of its natural entrance points. Where, because of the presence of islands, an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths. Islands within an indentation shall be included as if they were part of the water areas of the indentation."

While the only stated relevance of such islands is to the semicircle test, it is clear that the lines across the various mouths are to be the baselines for all purposes.[74] The application of this provision to the string of islands across the openings to the Lake Pelto-Terrebonne Bay-Timbalier Bay complex has raised the following questions: (a) between what points on the islands are the closing lines to be drawn, and (b) should the lines be drawn landward of a direct line between the entrance points on the mainland?

(a) It is Louisiana's primary contention that when islands appear in the mouth of a bay, the lines closing the bay and separating inland from territorial waters should be drawn between the mainland headlands and the *seawardmost* points on the islands. This position, however, is refuted by the language of Article 7 (3), which provides for the drawing of baselines "across the different *mouths*" (emphasis supplied), not across the

---

[74] The 24-mile limitation, for instance, is applied to the aggregate lengths of the closing lines. See 1 Shalowitz, *supra*, n. 7, at 221. See also the following Commentary of the International Law Commission:

"If, as a result of the presence of islands, an indentation whose features as a 'bay' have to be established has more than one mouth, the total length of the lines drawn across all the different mouths will be regarded as the width of the bay." [1956] 2 Y. B. Int'l L. Comm'n 269.

most seaward tips of the islands. There is no suggestion in the Convention that a mouth caused by islands is to be located in a manner any different from a mouth between points on the mainland—that is, by "a line joining the low-water marks of [the bay's] natural entrance points." The "natural entrance points" may, and in some instances in the Lake Pelto-Terrebonne Bay-Timbalier Bay complex do, coincide with the outermost edges of the islands. But there is no automatic correlation, and the headlands must be selected according to the same principles that govern the location of entrance points on the mainland.

(b) Louisiana argues in the alternative that even if the closing lines should not necessarily connect the most seaward points on the islands, in no event should they be drawn landward of a direct line between the entrance points on the mainland.[75] The purpose of Article 7 (3) is expressed in the following passage from the Commentary of the International Law Commission:

> "Here, the Commission's intention was to indicate that the presence of islands at the mouth of an indentation tends to link it more closely to the mainland, and this consideration may justify some alteration in the ratio between the width and the penetration of the indentation." [76]

___

[75] The extent to which this problem is presented by this case depends upon the exact location of the line between the entrance points on the mainland. The United States and Louisiana disagree as to the location of the headlands on the mainland, the United States having selected points considerably inland of those chosen by Louisiana. Since even the straight line between the mainland headlands urged by the United States is not entirely landward of what it considers the mouths between the islands, we do not postpone consideration of Louisiana's contention to a determination of the natural entrance points on the mainland.

[76] [1956] 2 Y. B. Int'l L. Comm'n 269.

It is evident, Louisiana argues, that Article 7 (3) was designed to enlarge rather than contract the area of inland waters; and that this policy would not be served by permitting islands intersected by a direct closing line between the mainland headlands to pull that line inward, particularly when the indentation would qualify as a bay even in the absence of the islands.[77] Rather, the line should be selected which will enclose the maximum area of inland waters.[78]

Louisiana's argument is undermined, however, by the natural effect of islands at the mouth of an indentation described in the International Law Commission Com-

---

[77] The direct, mainland-to-mainland line proposed by Louisiana across the Lake Pelto-Terrebonne Bay-Timbalier Bay indentation would meet the 24-mile test, but it appears that the line drawn by the United States would not. The exact length of the United States line need not be determined, however, because we hold that, for the purpose of the question at issue, there is no distinction between indentations which would qualify as bays without the presence of islands and those which would not. See next paragraph. Nothing in the language or the history of Article 7 (3) limits its application to those indentations which would not be bays except for the presence of islands. If the islands intersected by a direct line between the mainland headlands actually create multiple mouths, the selection of closing lines across those mouths is not optional.

[78] Shalowitz agrees that the purpose of Article 7 (3) supports a policy in favor of enclosing the maximum area of inland water. See 1 Shalowitz, *supra*, n. 7, at 225, n. 38. However, the context of his remarks is quite different from the present one. He there suggests that a policy in favor of enclosing the greatest area would support drawing lines out to islands wholly seaward of a direct line between the entrance points on the mainland, but not drawing lines inward to islands wholly within such a direct closing line. Elsewhere Shalowitz appears to agree that if lines are drawn to and between the islands, they should be across the natural entrance points, even if those natural entrance points are landward of a straight mainland-to-mainland line. See *id.*, at 221, fig. 40. See also Pearcy, Measurement of the U. S. Territorial Sea, 40 Dept. State Bull. 963, 966, fig. 4 (1959).

mentary. Just as the "presence of islands at the mouth of an indentation tends to link it more closely to the mainland," so also do the islands tend to separate the waters within from those without the entrances to the bay. Even waters which would be considered within the bay and therefore "landlocked" in the absence of the islands are physically excluded from the indentation if they lie seaward of the mouths between the islands. It would be anomalous indeed to say that waters are part of a bay even though they lie outside its natural entrance points. No doubt there could be islands which would not, whether because of their size, shape, or relationship to the mainland, be said to create more than one mouth to the bay. But where, as in the Lake Pelto-Terrebonne Bay-Timbalier Bay complex, a string of islands covers a large percentage of the distance between the mainland entrance points, the openings between the islands are distinct mouths outside of which the waters cannot sensibly be called "inland."

Louisiana purports to find support for its position in the provision of Article 7 (3) that "[i]slands within an indentation shall be included as if they were part of the water areas of the indentation." This provision would preclude drawing lines to an island wholly within the indentation,[79] Louisiana argues, and it should therefore

---

[79] Since this issue is not presented by the insular configurations at the Lake Pelto-Terrebonne Bay-Timbalier Bay complex, we express no opinion on it. However, we note that the issue may arise in relation to the Caminada Bay-Barataria Bay indentation. Despite our holding that "Ascension Bay," of which Caminada and Barataria Bays are a part, does satisfy the semicircle test, *supra*, at 52–53, it will be open to the United States to argue before the Master that "Ascension Bay" does not otherwise qualify as a bay under Article 7 (2) of the Convention on the Territorial Sea and the Contiguous Zone. A holding that "Ascension Bay" is not a true bay would preclude the drawing of a straight 24-mile baseline from

also preclude drawing closing lines to any part of an island landward of a straight line between the mainland headlands. We cannot, however, accept this construction of the Convention. An island which is intersected by a direct mainland-to-mainland closing line is not "within [the] indentation." Nor can an island which forms the mouth of an indentation be "within" it.

---

Caminada Pass to Empire Canal, see n. 64, *supra,* and would call into question the proper closing lines across the Caminada Bay-Barataria Bay indentation. In its reply brief, Louisiana for the first time contested the United States' proposal to draw baselines along the low-water marks on the fringe of islands across that indentation. Louisiana asserts that a straight closing line can be drawn between the appropriate entrances on the mainland which is entirely seaward of all the islands on which the United States has drawn baselines.

Although the question whether lines should be drawn inward to islands which are not intersected by a direct mainland-to-mainland closing line is one of construction of the Convention rather than of fact, for several reasons we have decided to leave its resolution to the Special Master in the first instance. The issue may not arise at all, if it is determined either that "Ascension Bay" is a true bay or that a direct line between the proper mainland headlands does intersect the islands. Moreover, the issue is a close one, yet one on which we have not had the benefit of concerted advocacy on both sides. On the one hand, the considerations which led us to reject Louisiana's contention with respect to islands intersected by a straight mainland-to-mainland closing line appear to militate in favor of drawing lines inward to islands which seemingly create distinct mouths to the indentation. This view is supported by the fact that Article 7 (3) contains no requirement that the islands be intersected by a mainland-to-mainland closing line; rather it speaks only of multiple mouths "because of the presence of islands." On the other hand, Article 7 (3) does provide that islands wholly "within" the indentation shall be treated as part of the water areas. Because the issue is a difficult one of first impression and few illuminating materials have been brought to our attention, we feel that our resolution of the question, if necessary, would be greatly aided by its prior submission to a neutral referee.

Article 7 (3) clearly distinguishes between islands which, by creating multiple mouths, form a part of the perimeter of the bay, and those which, by their presence wholly "within" the bay, are treated as part of its water areas.

In sum, we hold that where islands intersected by a direct closing line between the mainland headlands create multiple mouths to a bay, the bay should be closed by lines between the natural entrance points on the islands, even if those points are landward of the direct line between the mainland entrance points.

5. *Islands as headlands of bays.* With respect to many of the bays on the Louisiana coast the question is presented whether a headland of an indentation can be located on an island.[80] The United States argues

---

[80] The question arises with respect to low-tide elevations as well as islands. We think that in this context there can be no distinction between them. Article 7 (4) provides that the bay-closing line shall be drawn "between *the low-water marks* of the natural entrance points." (Emphasis supplied.) The line is to be drawn at low-tide, and, therefore, if a natural entrance point can be on an area of land surrounded by water, it can be on a low-tide elevation as well as an island.

The United States observes that under Article 4, see n. 89, *infra*, straight baselines "shall not be drawn to and from low-tide elevations, unless lighthouses or similar installations which are permanently above sea level have been built on them." *A fortiori*, the United States argues, bay-closing lines cannot be drawn to such low-tide elevations. The argument overlooks the different policy considerations underlying Articles 4 and 7. Straight baselines can be drawn to islands under Article 4 only if they enclose areas "sufficiently closely linked to the land domain to be subject to the regime of internal waters." Low-tide elevations obviously do not so closely tie the enclosed waters to the land; and if they could be used for straight baselines, "the distance between the baselines and the coast might be extended more than is required to fulfil the purpose for which the straight baseline method is applied." International Law Commission Commentary on its final draft, [1956] 2 Y. B. Int'l L. Comm'n 268. A further reason given by the International Law

that the Convention on the Territorial Sea and the Contiguous Zone flatly prohibits the drawing of bay-closing lines to islands. A true bay, it is said, is an "indentation" within the mainland, and it cannot be created by the "projection" of an island or islands from the coast. Moreover, the rule of Article 7 (3) that the area of an indentation lies between the closing line and "the low-water mark around the shore of the indentation" contemplates a perimeter of dry land unbroken by any opening other than the bay's entrance. Finally, the United States argues, such an opening between the island and the mainland would deprive the enclosed waters of the "landlocked" quality required in a true bay.

We do not agree that the face of the Convention clearly concludes the question. No language in Article 7 or elsewhere positively excludes all islands from the meaning of the "natural entrance points" to a bay. Waters within an indentation which are "landlocked" despite the bay's wide entrance surely would not lose that characteristic on account of an additional narrow opening to the sea. That the area of a bay is delimited by the "low-water mark around the shore" does not necessarily mean that the low-water mark must be continuous.[81]

Moreover, there is nothing in the history of the Convention or of the international law of bays which estab-

___

Commission for the prohibition against drawing straight baselines to low-tide elevations is that "it would not be possible at high tide to sight the points of departure of the baselines." *Ibid.* The need to identify headlands on the coast at high tide is not so great as it is in respect of basepoints in the sea, and for that reason the Convention measures bay-closing lines from the low-water mark.

[81] Compare the position of the United States that the low-water perimeter of indentations should be broken by water-crossing lines closing off distinct smaller indentations within the larger bay, *supra,* at 51.

lishes that a piece of land which is technically an island can never be the headland of a bay. Of course, the general understanding has been—and under the Convention certainly remains—that bays are indentations in the *mainland*,[82] and that islands off the shore are not headlands but at the most create multiple mouths to the bay.[83] In most instances and on most coasts it is no doubt true that islands would play only that restricted

---

[82] Most of the references by 19th and early 20th century authorities to the connection between islands and bays foreshadowed the modern concept—embodied in Article 7 (3) of the Convention—of islands creating multiple mouths to bays and tying the waters of the indentation more closely to the mainland. See, *e. g.*, Calvo, excerpted in Crocker, *supra*, n. 29, at 29; Piédelièvre, Précis de Droit International Public ou Droit des Gens (1894), in Crocker, at 389; Testa, Le Droit Public International Maritime (1886), in Crocker, at 448. Some authors, relying principally on an 1839 Franco-English convention regulating fisheries in the English Channel, stated that bay-closing lines should be drawn between the "extreme points of the mainland and sand banks." Latour, excerpted in Crocker, *supra*, n. 29, at 257. See also Perels, *id.*, at 357–358. In view of the contrast drawn between "mainland" and "sand banks," it may be that this formulation contemplated the drawing of closing lines to pieces of land closely related to the mainland but entirely surrounded by water, as sand banks often are.

[83] The United States argues that since the Convention in Article 7 (3) specifically recognizes that islands may create multiple *mouths* to bays, it cannot be construed to permit islands to create the *bays* themselves. Alternatively, the Government argues that if a closing line can be drawn from one side of a bay to an island as the headland on the other side, then it must be continued from the island to the nearest point on the mainland; and the distance to the mainland must be added to that across the bay in determining whether the 24-mile test is satisfied. These arguments, however, misconstrue the theory by which the headland is permitted to be located on the island—that the island is so closely aligned with the mainland as realistically to be considered an integral part of it. Thus viewed, there is no "mouth" between the island and the mainland.

role in the delimitation of bays. But much of the Louisiana coast does not fit the usual mold. It is marshy, insubstantial, riddled with canals and other waterways, and in places consists of numerous small clumps of land which are entirely surrounded by water and therefore technically islands. With respect to some spots along the Louisiana coast even the United States has receded from its rigid position and recognized that these insular configurations are really "part of the mainland." The western shore of the Lake Pelto-Terrebonne Bay-Timbalier Bay indentation is such a formation, and is treated by the United States as part of the coast.

This Court too has in the past adopted this realistic approach to similar land formations. In *Louisiana* v. *Mississippi,* 202 U. S. 1, 45–46, we wrote:

> "Mississippi denies that the peninsula of St. Bernard and the Louisiana Marshes constitute a peninsula in the true sense of the word, but insists that they constitute an archipelago of islands. Certainly there are in the body of the Louisiana Marshes or St. Bernard peninsula portions of sea marsh which might technically be called islands, because they are land entirely surrounded by water, but they are not true islands. They are rather, as the Commissioner of the General Land Office wrote the Mississippi land commissioner in 1904, 'in fact, hummocks of land surrounded by the marsh and swamp in said townships. . . .'
>
> "And when the Louisiana act used the words: 'thence bounded by the said Gulf to the place of beginning, including all islands within three leagues of the coast,' the coast referred to is the whole coast of the State, and the peninsula of St. Bernard formed an integral part of it."

Naturally this common-sense approach extends to coastal formations where there are only a few islands, or even a single island, as well as to those where there are many. Such has been the view of other courts [84]

[84] In the case of *The "Anna,"* 165 Eng. Rep. 809 (1805), the British High Court of Admiralty was called upon to determine a claim that an American ship seized by a privateer off the Mississippi River Delta had been wrongfully taken in American territorial waters. In holding for the claimant, the court wrote:

"The capture was made, it seems, at the mouth of the River Mississippi, and, as it is contended in the claim, within the boundaries of the United States. We all know that the rule of law on this subject is '*terrae dominium finitur, ubi finitur armorum vis*,' and since the introduction of fire-arms, that distance has usually been recognised to be about three miles from the shore. But it so happens in this case, that a question arises as to what is to be deemed the shore, since there are a number of little mud islands composed of earth and trees drifted down by the river, which form a kind of portico to the mainland. It is contended that these are not to be considered as any part of the territory of America, that they are a sort of '*no man's land*,' not of consistency enough to support the purposes of life, uninhabited, and resorted to, only, for shooting and taking birds' nests. It is argued that the line of territory is to be taken only from the Balise, which is a fort raised on made land by the former Spanish possessors. I am of a different opinion; I think that the protection of territory is to be reckoned from these islands; and that they are the natural appendages of the coast on which they border, and from which indeed they are formed. Their elements are derived immediately from the territory, and on the principle of alluvium and increment, on which so much is to be found in the books of law. . . ." *Id.*, at 814–815.

The United States argues that the decision is not in point because it had nothing to do with the delimitation of bays and merely held, as Article 10 of the Convention now provides, see n. 94, *infra*, that the three-mile belt is to be measured from islands in the same way as from the mainland. But if the court had been of the view that the three-mile belt extended from islands as well as the mainland, it would not have had to decide that the mud islands were "deemed the shore." And the opinion in *The "Anna"* gave rise to several categorical statements by 19th century authorities that "[t]he term 'coasts' includes the natural appendages of the territory which rise

and of textwriters.[85] Much of the Louisiana coast on or near the Mississippi River Delta is of the same general consistency as the western shore of the Lake Pelto-

out of the water, although these islands are not of sufficient firmness to be inhabited or fortified . . . ." H. Wheaton, Elements of International Law 256 (8th ed. 1866). See also Halleck, International Law (4th ed. 1908), in Crocker, *supra*, n. 29, at 88–90. And it is ancient lore that islands created by sedimentation at river entrances are peculiarly integrated with the mainland itself:

"The islands situated at the mouth of a river are embraced as part of the territory, even when they are not occupied. They are considered as forming the beginning of the government of the country, because the elements of which they are composed have become detached from the soil itself. It is from their coast that the littoral sea commences." Nys, Le Droit International (1904), in Crocker, at 321.

Our discussion of these authorities should not be taken as suggesting that, under the now controlling Convention on the Territorial Sea and the Contiguous Zone, every Mississippi River Delta mudlump or other insular formation is a part of the coast. We do believe, however, that the origin of the islands and their resultant connection with the shore is one consideration relevant to the determination of whether they are so closely tied to the mainland as realistically to be considered a part of it.

[85] "Obviously, some islands must be treated as if they were part of the mainland. The size of the island, however, cannot in itself serve as a criterion, as it must be considered in relationship to its shape, orientation and distance from the mainland." Boggs, Delimitation of Seaward Areas under National Jurisdiction, 45 Am. J. Int'l L. 240, 258 (1951).

"Islands close to the shore may create some unique problems. They may be near, separated from the mainland by so little water that for all practical purposes the coast of the island is identified as that of the mainland." Pearcy, Geographical Aspects of the Law of the Sea, 49 Annals of Assn. of American Geographers No. 1, p. 1, at 9 (1959).

The Director of the Coast and Geodetic Survey, Department of Commerce, has stated the following rule for the assimilation of islands to the mainland:

"The coast line should not depart from the mainland to embrace offshore islands, except where such islands either form a portico

Terrebonne Bay-Timbalier Bay complex, and some of the islands may be so closely linked to the mainland as realistically to be assimilated to it. While there is little objective guidance on this question to be found in international law, the question whether a particular island is to be treated as part of the mainland would depend on such factors as its size, its distance from the mainland, the depth and utility of the intervening waters, the shape of the island, and its relationship to the configuration or curvature of the coast.[86] We leave to the Special Master the task of determining in the first instance—in the light of these and any other relevant criteria and any evidence he finds it helpful to consider—whether the islands which Louisiana has designated as headlands of bays are so integrally related to the mainland that they are realistically parts of the "coast" within the meaning of the Convention on the Territorial Sea and the Contiguous Zone.

6. *Fringes of islands.* At several places [87] the question is raised whether areas between the mainland and fringes

---

to the mainland and are so situated that the waters between them and the mainland are sufficiently enclosed to constitute inland waters, *or they form an integral part of a land form.*" Memorandum of April 18, 1961, excerpted in 1 Shalowitz, *supra,* n. 7, at 161, n. 125. (Emphasis supplied.)

Shalowitz has recognized that "[w]ith regard to determining which islands are part of a land form and which are not, no precise standard is possible. Each case must be individually considered within the framework of the principal rule." *Id.,* at 162. And see Strohl, *supra,* n. 23, at 76, fig. 18.

[86] This enumeration is intended to be illustrative rather than exhaustive.

[87] One such place is Caillou Bay, the body of water between the mainland and the westernmost of the string of islands known as the Isles Dernières. Another is the large area consisting of Chandeleur Sound and Breton Sound between the northeastern shores of the Mississippi River Delta and the Chandeleur Islands chain. This latter area is not in dispute, for the United States, while asserting that the sounds are not necessarily inland waters under the

or chains of islands along the coast are inland waters. The parties agree that no article of the Convention specifically provides that such areas are inland waters. Louisiana argues that they are inland waters, under any one of several theories: that such island fringes form the perimeter of bays under Article 7, that straight baselines must be drawn along the islands under Article 4, or that the waters should be deemed "inland" under general principles of international law which antedate and supplement the Convention on the Territorial Sea and the Contiguous Zone. The position of the United States is that such island chains can be taken into account as enclosing inland waters only by drawing straight baselines; yet the decision whether to draw such baselines is within the sole discretion of the Federal Government, and the United States has not chosen to do so.

We have concluded that Article 7 does not encompass bays formed in part by islands which cannot realistically be considered part of the mainland.[88] Article 7 defines bays as indentations in the "coast," a term which is used in contrast with "islands" throughout the Convention. Moreover, it is apparent from the face and the history of the Convention that such insular formations were intended to be governed solely by the provision in

Convention, has conceded that they belong to Louisiana. That concession was made at an early stage of this litigation, see n. 97, *infra,* and the United States has decided not to withdraw it despite the subsequent ratification of the Convention. Louisiana further contends that some of the Chandeleur Islands form part of the perimeter of a bay—which it calls "Isle au Breton Bay"—enclosing inland waters between their southern edges and the North and Main Passes of the Mississippi River Delta. The United States objects to this use of the island fringe.

[88] Louisiana does not contend that any of the islands in question is so closely aligned with the mainland as to be deemed a part of it, and we agree that none of the islands would fit that description.

68

Article 4 for straight baselines.[89] The language of Article 4 itself is the clearest indication of that intent:

"1. In localities where the coast line is deeply indented and cut into, *or if there is a fringe of islands along the coast in its immediate vicinity,* the method of straight baselines joining appropriate points may be employed in drawing the baseline from which the breadth of the territorial sea is measured." (Emphasis supplied.)

The drafters of the Convention and their predecessors were aware that international law permitted such island fringes in some circumstances to enclose inland waters.[90]

---

[89] "1. In localities where the coast line is deeply indented and cut into, or if there is a fringe of islands along the coast in its immediate vicinity, the method of straight baselines joining appropriate points may be employed in drawing the baseline from which the breadth of the territorial sea is measured.

"2. The drawing of such baselines must not depart to any appreciable extent from the general direction of the coast, and the sea areas lying within the lines must be sufficiently closely linked to the land domain to be subject to the régime of internal waters.

"3. Baselines shall not be drawn to and from low-tide elevations, unless lighthouses or similar installations which are permanently above sea level have been built on them.

"4. Where the method of straight baselines is applicable under the provisions of paragraph 1, account may be taken, in determining particular baselines, of economic interests peculiar to the region concerned, the reality and the importance of which are clearly evidenced by a long usage.

"5. The system of straight baselines may not be applied by a State in such a manner as to cut off from the high seas the territorial sea of another State.

"6. The coastal State must clearly indicate straight baselines on charts, to which due publicity must be given."

[90] Although international accord on the concept of straight baselines along island chains is a fairly recent development, there are some earlier statements of the principle. See, *e. g.,* Raestad, La Mer

The principle was recognized and applied by the International Court of Justice in the *Fisheries Case* (*United Kingdom* v. *Norway*), [1951] I. C. J. 116, in which Norway was held legitimately to have drawn straight baselines along the "skjaergaard," literally a "rock rampart" composed of hundreds of thousands of insular formations which ringed the mainland. Thereafter, with the *Fisheries Case* as the model, attempts were made to draft concrete rules for the uniform treatment of such island fringes, and both the International Law Commission and the 1958 Geneva Conference discussed the problem at length.[91]   There was, however, too little technical information or consensus among nations on that and related subjects to allow the formulation of uniform rules.[92]   It was agreed, therefore, that the problem should be handled as it had been by the International

Territoriale (1913), excerpted in Crocker, *supra*, n. 29, at 407. See generally McDougal & Burke, *supra*, n. 26, at 314–316.

[91] See the discussion of the International Law Commission at [1954] 1 Y. B. Int'l L. Comm'n 66; [1955] 1 Y. B. Int'l L. Comm'n 197, 218, 252; [1955] 2 Y. B. Int'l L. Comm'n 37; [1956] 1 Y. B. Int'l L. Comm'n 185, 194–195; and of the 1958 Geneva Conference in United Nations Conference on the Law of the Sea, *supra*, n. 42, at 43–44, 60, 141, 156, 162–163.   A thorough review of the practice of nations and international studies of the problem is found at 4 M. Whiteman, Digest of International Law 274–303.

[92] The 1930 Hague Convention, for example, was unable to recommend a specific provision:

"With regard to a group of islands (archipelago) and islands situated along the coast, the majority of the Sub-Committee was of opinion that a distance of ten miles should be adopted as a basis for measuring the territorial sea outward in the direction of the high sea.   Owing to the lack of technical details, however, the idea of drafting a definite text on this subject had to be abandoned." Acts of the Conference for the Codification of International Law, *supra*, n. 29, at 219.

See also Fitzmaurice, *supra*, n. 63, at 88–90; McDougal & Burke, *supra*, n. 26, at 377–386.

Court of Justice in the *Fisheries Case:* each nation was left free to draw straight baselines along suitable insular configurations if it so desired.[93] In the light of this reso-

---

[93] The history of the subject is summarized in the Reference Guide to the Articles Concerning the Law of the Sea Adopted by the International Law Commission at its Eighth Session, U. N. Doc. A/C.6/L.378, p. 45, n. 1 (1956), as follows:

"In his first report . . . the special rapporteur proposed an article entitled 'Groups of Islands.' This was article 10, which read as follows:

" 'With regard to a group of islands (archipelago) and islands situated along the coast, the ten-mile line shall be adopted as the base line for measuring the territorial sea in the direction of the high sea. The waters included within the group shall constitute inland waters.'

"He explained, however, that he had inserted this text 'not as expressing the law at present in force, but as a basis of discussion should the Commission wish to study a text envisaging the progressive development of international law on this subject.' He referred to a passage in the Judgment of the International Court of Justice in the Fisheries case where the Court had said . . . :

" 'In this connection, the practice of States does not justify the formulation of any general rule of law. The attempts that have been made to subject groups of islands or coastal archipelagoes to conditions analogous to the limitations concerning bays (distance between the islands not exceeding twice the breadth of the territorial waters, or ten or twelve sea miles), have not got beyond the stage of proposals.'

"In his second report . . . the special rapporteur suggested as article 10 an abbreviated version of his earlier proposal, which now simply read as follows:

" 'With regard to a group of islands (archipelago) and islands situated along the coast, the ten mile line shall be adopted as the base line.'

"After consulting the Committee of Experts the special rapporteur put forward a more elaborate proposal . . . and yet a further proposal in his third report . . . .

"The latter proposal read as follows:

" '1. The term "group of islands," in the juridical sense, shall be deemed to mean three or more islands enclosing a portion of the

lution of the problem, it is clear that the drafters did not intend to leave island fringes beyond the scope of the Convention altogether. The deliberate decision was that such island formations are not to be treated differently from any other islands [94] unless the coastal nation decides to draw straight baselines.[95]

---

sea when joined by straight lines not exceeding five miles in length, except that one such line may extend to a maximum of ten miles.

" '2. The straight lines specified in the preceding paragraph shall be the base lines for measuring the territorial sea; waters lying within the area bounded by such base lines and the islands themselves shall be considered as inland waters.

" '3. A group of islands may likewise be formed by a string of islands taken together with a portion of the mainland coastline. The rules set forth in paragraphs 1 and 2 of this article shall apply *pari passu.'*

"The Commission, however, after postponing the question in 1954, *decided in 1955 that article 5, which dealt with 'Straight baselines,' might be applicable to groups of islands situated off the coasts, while the general rules would normally apply to other islands forming a group.* This position was confirmed in 1956, the Commission adding that it was prevented from stating an opinion on this subject not only by disagreement on the breadth of the territorial sea but also by lack of technical information. The Commission hoped, however, that if an international conference were subsequently to study the proposed rules, it would give attention to this problem which the Commission recognized to be an important one." (Emphasis supplied.)

While the 1958 Geneva Conference gave the problem its attention, it was prevented by the same reasons from formulating an article dealing with groups and fringes of islands other than Article 4.

[94] Islands are normally covered by Article 10:

"1. An island is a naturally-formed area of land, surrounded by water, which is above water at high-tide.

"2. The territorial sea of an island is measured in accordance with the provisions of these articles."

[95] This conclusion is shared by Shalowitz. See 1 Shalowitz, *supra*, n. 7, at 227 and n. 44. Strohl posits that "a fringe of islands can make up one side of a bay," Strohl, *supra*, n. 23, at 72, but recognizes that the only provision of the Convention which would

In *United States* v. *California,* 381 U. S. 139, 168, we held that "the choice under the Convention to use the straight-base-line method for determining inland waters claimed against other nations is one that rests with the Federal Government, and not with the individual States." [96] Since the United States asserts that it has not drawn and does not want to draw straight baselines along the Louisiana coast, that disclaimer would, under the *California* decision, be conclusive of the matter. Louisiana argues, however, that because the Louisiana coast is so perfectly suited to the straight baseline method, and because it is clear that the United States would employ it in the conduct of its international affairs were it not for this lawsuit, the Court should reconsider its holding in *California* and itself draw appropriate baselines. While we agree that the straight baseline method was designed for precisely such coasts as the Mississippi River Delta area, we adhere to the position that the selection of this optional method of establishing bound-

authorize such a baseline is Article 4. *Id.,* at 60. This conclusion is not undermined by occasional references to an insular formation as creating a "bay." See, *e. g.,* [1955] 1 Y. B. Int'l L. Comm'n 211, Bouchez, *supra,* n. 23, at 233 (both referring to Long Island Sound); *Manchester* v. *Massachusetts,* 139 U. S. 240 (referring to Buzzard's Bay). Only one authority appears to assume, without discussion, that a bay formed by islands would be governed by the provisions of Article 7. Pearcy, *supra,* n. 78, at 965. (The area in question was that between the coast of Florida and the chain of Keys curving to the south and east. The United States points out that they are linked by a permanent highway and therefore may be considered as part of the mainland.)

[96] In the same vein, we held that the choice whether to employ the concept of a "fictitious bay" was that of the Federal Government alone. 381 U. S., at 172. That holding was, of course, consistent with the conclusion that the drawing of straight baselines is left to the Federal Government, for a "fictitious bay" is merely the configuration which results from drawing straight baselines from the mainland to a string of islands along the coast. See 381 U. S., at 170, n. 38.

aries should be left to the branches of Government responsible for the formulation and implementation of foreign policy. It would be inappropriate for this Court to review or overturn the considered decision of the United States, albeit partially motivated by a domestic concern, not to extend its borders to the furthest extent consonant with international law.[97]

---

[97] Louisiana further contends that the United States is estopped from denying the "inland water" status of such areas by its concession in earlier stages of this litigation that the areas between the mainland and all the offshore islands were inland waters. We took note of this concession in *United States* v. *Louisiana,* 363 U. S. 1, 67, n. 108:

"The Government concedes that all the islands which are within three leagues of Louisiana's shore and therefore belong to it under the terms of its Act of Admission, happen to be so situated that the waters between them and the mainland are sufficiently enclosed to constitute inland waters. Thus, Louisiana is entitled to the lands beneath those waters quite apart from the affirmative grant of the Submerged Lands Act, under the rule of *Pollard's Lessee* v. *Hagan,* 3 How. 212. Furthermore, since the islands enclose inland waters, a line drawn around those islands and the intervening waters would constitute the 'coast' of Louisiana within the definition of the Submerged Lands Act. Since that Act confirms to all States rights in submerged lands three miles from their coasts, the Government concedes that Louisiana would be entitled not only to the inland waters enclosed by the islands, but to an additional three miles beyond those islands as well. *We do not intend, however, in passing on these motions, to settle the location of the coastline of Louisiana or that of any other State."* (Emphasis supplied.)

As we stressed in that case, this Court has placed no imprimatur on that position. Nor do we think the United States is bound by it. Louisiana has not relied to its detriment on the concession, which appears to have been made primarily for purposes of reaching agreement on the leasing of the submerged lands pending a final ruling on their ownership. The Interim Agreement of 1956 specifically recognized that neither party would be bound by its positions:

"The submerged lands in the Gulf of Mexico are divided for the purposes hereof into four zones as shown on the plat annexed hereto as Exhibit 'A,' which reflects as a base line the so-called 'Chapman-Line.' No inference or conclusion of fact or law from

7. *Historic inland waters.* Louisiana argues that all the waters of the Mississippi River Delta, and East Bay in particular, are "so-called 'historic' bays" within the meaning of Article 7 (6),[98] and that they are therefore inland waters notwithstanding their failure to meet the geographical requirements of Article 7 and the United States' refusal to draw straight baselines.[99] Historic

---

the said use of the so-called 'Chapman-Line' or any other boundary of said zones is to be drawn to the benefit or prejudice of any party hereto . . . ."

Moreover, we note that the concession did not include as inland waters the area Louisiana designates as "Isle au Breton Bay." See n. 87, *supra.*

It might be argued that the United States' concession reflected its firm and continuing international policy to enclose inland waters within island fringes. It is not contended at this time, however, that the United States has taken that posture in its international relations to such an extent that it could be said to have, in effect, utilized the straight baseline approach sanctioned by Article 4 of the Convention. If that had been the consistent official international stance of the Government, it arguably could not abandon that stance solely to gain advantage in a lawsuit to the detriment of Louisiana. Cf. *United States* v. *California,* 381 U. S. 139, 168: "[A] contraction of a State's recognized territory imposed by the Federal Government in the name of foreign policy would be highly questionable." We do not intend to preclude Louisiana from arguing before the Special Master that, until this stage of the lawsuit, the United States had actually drawn its international boundaries in accordance with the principles and methods embodied in Article 4 of the Convention on the Territorial Sea and the Contiguous Zone.

[98] See n. 72, *supra.*

[99] Louisiana also suggests that the indentations between the passes of the Mississippi River Delta are part of the river mouth and therefore inland waters under Article 13 of the Convention:

"If a river flows directly into the sea, the baseline shall be a straight line across the mouth of the river between points on the low-tide line of its banks."

The Article obviously does not encompass indentations between arms of land formed by the river but not containing it.

bays are not defined in the Convention, and the term therefore derives its content from general principles of international law.[100]  As the absence of a definition indicates, there is no universal accord on the exact meaning of historic waters.[101]  There is substantial agreement, however, on the outlines of the doctrine and on the type of showing which a coastal nation must make in order to establish a claim to historic inland waters.[102]  But because the concept of historic waters is still relatively imprecise and its application to particular areas raises primarily factual questions, we leave to the Special Master—as we did in *United States* v. *California*—the task of determining in the first instance whether any of the waters off the Louisiana coast are historic bays.  We do not think the ultimate resolution of this litigation would be hastened by any further discussion of the subject at this time, beyond the remarks below.

In its effort to establish that the waters of the Delta have been subjected to the continuous authority of the coastal nation, Louisiana has relied heavily on its own activities as well as on those of the Federal Government. The United States contends that those state activities cannot in this lawsuit support the position that the Delta waters are historic bays.  The argument is not

---

[100] The United States argues that the Convention recognizes only historic *bays* and not other kinds of inland water bodies. We do not pass on this contention except to note that, by the terms of the Convention, historic bays need not conform to the normal geographic tests and therefore need not be true bays.  How unlike a true bay a body of water can be and still qualify as a historic bay we need not decide, for all of the areas of the Mississippi River Delta which Louisiana claims to be historic inland waters are indentations sufficiently resembling bays that they would clearly qualify under Article 7 (6) if historic title can be proved.

[101] See *supra,* at 24.

[102] See n. 27, *supra.*

that such exercises of authority by Louisiana would not be relevant to a claim of historic title *vis-à-vis* another nation. On the contrary, the United States has "[n]o doubt [that] the national government may, if it chooses, rely on State action to support its own historic claim as against other nations." [103] But, the United States asserts, "a State cannot oblige it to do so or to accept State action as binding in a domestic case such as the present one." In brief, then, the United States' position is that it can prevent judicial recognition of a ripened claim to historic title merely by lodging a disclaimer with the court.

In *United States* v. *California* we noted, but found it unnecessary to pass on, the United States' contention that historic title cannot be founded upon exercises of state authority because a claim to historic inland waters can be maintained only if endorsed by the United States. We there sustained the Master's determination that, even assuming the relevance of California's assertions of sovereignty over the coastal waters, they did not establish historic title. The United States' disclaimer was credited only because the case presented such "questionable evidence of continuous and exclusive assertions of

---

[103] In this the United States appears to be correct. While the unauthorized activities of private citizens could generally not support a claim of historic title, see Juridical Regime of Historic Waters, Including Historic Bays, *supra,* n. 27, at 14–15; Bouchez, *supra,* n. 23, at 238; Strohl, *supra,* n. 23, at 303–304, the actions of local governments, if not repudiated by or inimical to the interests of the national sovereign, are assertions of dominion as against other nations. And claims to historic title have been based in part on such actions. See the opinion of the Court of Commissioners of Alabama Claims in *Stetson* v. *The United States,* quoted in 4 J. Moore, International Arbitrations 4332, 4339 (1898); Opinion of Attorney General Randolph on the seizure of the ship "Grange" in Delaware Bay, 1 Op. Atty. Gen. 32 (1793). See generally McDougal & Burke, *supra,* n. 26, at 360–361.

dominion." 381 U. S., at 175. And we noted that we were "reluctant to hold that such a disclaimer would be decisive in all circumstances, for a case might arise in which the historic evidence was clear beyond doubt." *Ibid.* Thus, the Court indicated its unwillingness to give the United States the same complete discretion to block a claim of historic inland waters as it possesses to decline to draw straight baselines.

While we do not now decide that Louisiana's evidence of historic waters is "clear beyond doubt," neither are we in a position to say that it is so "questionable" that the United States' disclaimer is conclusive. We do decide, however, that the Special Master should consider state exercises of dominion as relevant to the existence of historic title. The Convention was, of course, designed with an eye to affairs between nations rather than domestic disputes. But, as we suggested in *United States* v. *California,* it would be inequitable in adapting the principles of international law to the resolution of a domestic controversy, to permit the National Government to distort those principles, in the name of its power over foreign relations and external affairs, by denying any effect to past events.[104] The only fair way to apply the Convention's recognition of historic bays to this case, then, is to treat the claim of historic waters as if it were being made by the national sovereign and opposed by another nation. To the extent the United

[104] It is one thing to say that the United States should not be required to take the novel, affirmative step of adding to its territory by drawing straight baselines. It would be quite another to allow the United States to prevent recognition of a historic title which may already have ripened because of *past* events but which is called into question for the first time in a domestic lawsuit. The latter, we believe, would approach an impermissible contraction of territory against which we cautioned in *United States* v. *California.* See n. 97, *supra.*

States could rely on state activities in advancing such a claim, they are relevant to the determination of the issue in this case.

### III.

In due course a Special Master will be appointed by the Court to make a preliminary determination, consistent with this opinion, of the precise boundaries of the submerged lands owned by Louisiana in the Gulf of Mexico.

*It is so ordered.*

[Map of Louisiana coast follows this page.]

THE CHIEF JUSTICE and MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.

We must decide in this case the meaning of the term "inland waters," as used in the Submerged Lands Act of 1953.[1] Although the value of all the submerged lands probably could be stated only in astronomical figures, this dispute is a minor one involving only a comparatively small segment of land adjacent to Louisiana.[2] The Court chooses as the proper meaning the com-

---

[1] 67 Stat. 29, 43 U. S. C. §§ 1301–1315.

[2] For this reason it is difficult to understand why the Federal Government is subjecting the State of Louisiana and this Court to a long series of technical and wasteful lawsuits. When all of them are over the United States will have little more undersea land than it already had. The only practical difference that I can see at the moment if the Federal Government wins is that it, instead of the State, will have power to lease the land to some oil company. On the other hand should Louisiana win, it can lease the land perhaps at a bigger price and then, as I pointed out in a prior separate opinion, *United States* v. *Louisiana,* 363 U. S. 1, 85, 98–100, devote its oil income to public education.

Louisiana Coastline (U.S.C. & G.S. Chart 1115 & 1116)
——— Louisiana Coastline, Act 33 of 1954 (Inland Water Line)
——— 100 ——— Outer edge of Continental Shelf

UNITED STATES - GULF COAST
MISSISSIPPI RIVER TO GALVESTON

SOUNDINGS IN FATHOMS
AT MEAN LOW WATER

LAKE PONTCHARTRAIN

NEW ORLEANS

LAKE CHARLES

GULF OF MEXICO

MARSH I.

GULF OF M

plex series of definitions incorporated in the Convention on the Territorial Sea and the Contiguous Zone, an international treaty approved by the President and ratified by the Senate.[3] In making this choice, the Court relies on the recent decision by a divided Court that this standard should be used in determining the boundaries of California's "inland waters" along the California coast. *United States* v. *California,* 381 U. S. 139 (1965) (generally referred to as the second *California* case). I cannot agree to application of the same standard to Louisiana, where coastal conditions are wholly different[4] and where the Convention standard, which the Court thought would provide some certainty and stability for California, can only cause chaos and confusion. Nor can I find any justification for applying the Convention standard applied in the second *California* case to Louisiana, a State that was not a party to the West Coast litigation but urges us to adopt a different standard, one especially convenient for application to Louisiana's own unusual coast, and one never even considered in the West Coast litigation.[5] Under these circumstances I must dissent.

---

[3] 44 Dept. State Bull. 609; [1964] 15 U. S. T. (pt. 2) 1607, T. I. A. S. No. 5639.

[4] "History is subject to geology. Every day the sea encroaches somewhere upon the land, or the land upon the sea; cities disappear under the water, and sunken cathedrals ring their melancholy bells. Mountains rise and fall in the rhythm of emergence and erosion; rivers swell and flood, or dry up, or change their course; valleys become deserts, and isthmuses become straits. To the geologic eye all the surface of the earth is a fluid form, and man moves upon it as insecurely as Peter walking on the waves to Christ."

W. & A. Durant, The Lessons of History 14–15 (1968).

[5] The propriety of using the Coast Guard line as the seaward line of inland waters was not litigated in the second *California* case. The issue was not raised by the pleadings; nor was it argued. The point was raised once on oral argument when MR. JUSTICE BRENNAN asked if the United States relied on the Coast Guard line. Mr. Cox,

I would hold that "inland waters" should be measured in Louisiana, and in any other State with similar coastal characteristics, by the standard urged by Louisiana—the Coast Guard line established years ago, under the authority of an 1895 Act of Congress, to mark off the boundaries of the States' "inland waters." Such a holding would put an end to a useless, unnecessary litigation, over an issue that can well be characterized as *de minimis* so far as the practical effect to the United States is concerned.

## I.

In 1947 this Court decided that no one of the States bordering on the Atlantic or Pacific Ocean or on the Gulf of Mexico owned any part of the land submerged under the waters lying adjacent to its shores.[6] In 1953 Congress, in the Submerged Lands Act, "restored" to the States what it thought our holding had wrongfully taken away from them. What the Act did was in effect to quitclaim to each coastal State submerged land extending three geographic miles seaward from the State's coastline, except that under certain circumstances States bordering on the Gulf of Mexico were entitled to a maximum of not more than three leagues (roughly nine geographic miles) from the coastline. Under the Act submerged land of the Continental Shelf more than three miles or three leagues beyond the coastline is property of the United States. The Act defined "coast line" in § 2 (c) as "the line of ordinary low water along that portion of the coast which is in direct contact with the

the Solicitor General, replied that the United States placed no reliance on it, the purpose of that line being "to indicate where the inland rules applicable to vessels control and where the international ocean rules control." He added that Louisiana will contend, when her case reaches here, that the Coast Guard line does control but that it was not involved in the California segment of the litigation.

[6] *United States* v. *California*, 332 U. S. 19 (1947).

open sea and the line marking the seaward limit of inland waters." This definition of "coast line" is, of course, not clear enough in itself for one to go out and look around the waters and fix the boundary line between submerged lands belonging to the Federal Government and those belonging to the States, particularly since the crucial term "inland waters" is not defined in the Act at all. There appears to be one thing certain about the problem, however, and that is that the dispute between Louisiana and the United States is no part of international affairs subject to international law, but is exclusively a domestic controversy between the State and Nation. The United States, nevertheless, contends that in determining this purely domestic dispute, the Act's words must be given their content in international law and the controlling principles must be found in the international Convention. The United States places its chief reliance for this contention on the second *California* case. In that case some questions arose about whether certain segments of the California coastline, particularly with reference to bays, inlets, sounds, indentations, and islands, were within California's inland waters. There the Court did not pass on the applicability of the 1895 Act of Congress,[7] and seeking a satisfactory way to

---

[7] This is vividly demonstrated by the colloquy between MR. JUSTICE BRENNAN and Solicitor General Cox, referred to in n. 5 above:

"JUSTICE BRENNAN: Now, I have forgotten—maybe the briefs cover this provision of Title 33 under which the Commandant of the Coast Guard is required to fix the lines dividing the high seas from inland waters.

"Do you rely on that at all?

"MR. Cox: Oh, no. And neither does California.

"JUSTICE BRENNAN: Well, would you tell me why part (a)(2) of that title dealing with this very section, for example, there is a provision that 'The outer limits of inland waters in Santa Barbara Harbor shall be,' and then there is a description, a line drawn from Santa Barbara, the light-blue one, past the Santa

determine some of the perplexing problems about treat-
ment of bays, etc., as inland waters, a divided Court con-
cluded to resort to the treaty mentioned.   The majority
believed reliance on the treaty was dictated by the need

---

Barbara Harbor breakwater which, if I locate it on this map, is
some little segment away in the upper corner, beneath the word
'Santa Barbara' on your map.   But you don't rely at all on the
definition of inland waters on Congressional definition in another
statute.

"MR. Cox: No.   No.   We think that those statutes relate simply
to—had one purpose and only one purpose, and that is to indicate
where the inland rules applicable to vessels control and where the
international ocean rules control.

"JUSTICE BRENNAN: Just traffic rules of the road.

"MR. Cox: They are just traffic rules of the road, we would say.

"*Now, in the Louisiana case, if and when it ever gets here, Lou-
isiana will contend it relies on that because in that instance it hap-
pens that the Coast Guard line is placed way out in the Gulf, but
here it is apparently placed way in.*

"JUSTICE BRENNAN: As I get it, it is only a tiny bit of a corner
up there at that point.

"MR. Cox: That is right.   And, of course, this is terribly deep
water and ocean-going vessels use it.

"Now, I should say that there are some small points in these
bays that we would agree were harbors.   For example, we would
agree that up—if you can remember Monterey Bay—that is not
on this map—it sort of hooks around, comes around in like this
(demonstrating), and the shore comes out this way.   We would
agree that these little points up here are harbors.   If you have
been to Monterey, we would agree that the area in which you see
fishing vessels anchored, up there at the dock, that is a harbor.
That has not been argued about here.   We concede.   And there
may be a few little points up next to Santa Barbara that come the
same way as harbors.

"JUSTICE BRENNAN: Well, I notice that the Commandant has
defined inland waters from Monterey Harbor, San Luis Obispo,
San Pedro, Santa Barbara, Crescent City, Isthmus Cove at Santa
Catalina and Avalon Bay, but you don't rely on any of these.

"MR. Cox: No.   We don't rely on any of them.

"JUSTICE BRENNAN: You don't rely on that.

"MR. Cox: We don't rely on it, no."   (Emphasis added.)

to adopt "the best and most workable definitions available," 381 U. S., at 165, thus, as it was believed, adding stability to the operation of the Act and carrying out a purpose of the Act's proponents to give security of title to the State and its oil lessees.

But if that turns out to be the result of using the treaty definitions in the second *California* case, it will certainly not be the result here, for there are crucial differences between the two coasts. California waters are in the main deep and often are navigable very close to shore. There are few indentations along that State's coast, and most of these are smooth or relatively regular in shape. The shoreline is, of course, subject to changes by natural forces, but the land along the shore is for the most part hard and rocky, and therefore such changes in the shoreline have been extremely gradual. The Louisiana coast is entirely different in many ways. The waters off the shore are shallow and often not readily navigable. The shoreline is marked by numerous complex indentations, and indeed the United States, in a brief filed earlier in this litigation, itself recognized that "[t]he Louisiana *coast* line is an extraordinarily complicated one." [8] (Emphasis added.) Even more important than this complexity of the present coastline is its highly volatile nature. The mighty Mississippi brings sediment and mud which may build up little islands and mud elevations one day and destroy them the next. Parts of the Mississippi Delta are receding at a rapid rate, while in other parts deposits are rapidly being built up. Recent projects along the Atchafalaya River may cause that river to begin building another massive delta that could grow seaward at a rate of almost one mile per year. Because the coast is composed

---

[8] Memorandum for the United States in Reply to Louisiana's Brief in Opposition to Motion for Leave to File Complaint, March 7, 1956, pp. 9–10.

of soft, silt-like material, because the water is for the most part relatively shallow, and because the elevation of the land along the shore is extraordinarily low, the shoreline often changes drastically merely as a result of temporary variations in winds and waves. Offshore islands sometimes appear or disappear spontaneously as a result of the same forces, and of course major hurricanes to which Louisiana—unlike California—is occasionally exposed, cause even more substantial changes.

In Louisiana, consequently, the Court cannot correctly say about its holding what it said with some plausibility in the second *California* case:

> "Before today's decision no one could say. with assurance where lay the line of inland waters as contemplated by the Act; hence there could have been no tenable reliance on any particular line. After today that situation will have changed. Expectations will be established and reliance placed on the line we define. . . . 'Freezing' the meaning of 'inland waters' in terms of the Convention . . . serves to fulfill the requirements of definiteness and stability which should attend any congressional grant of property rights belonging to the United States." 381 U. S., at 166–167.

Today's holding does not grant Louisiana the "definiteness and stability" promised to California. A company having an oil lease now under ocean waters of Louisiana gets no more than an ambulatory title: here today and gone tomorrow. And with its title, I suppose, will go all of its expensive investment in developing the lease. Stable business cannot be fostered that way. The ambulatory title, which the Court finds in the Submerged Lands Act, I think frustrates the just expectations Congress desired that oil companies have in the stability of their leases for exploitation of oil under the sea.

Nothing was said in the second *California* opinion indicating that the treaty provisions the Court borrowed in that case were to be mechanically used to fit every land dispute. The treaty was chosen there because the Court thought it provided the "best and most workable definitions available" in the dispute between California and the United States; the doctrine cannot fit all cases. If it worked for stability in California, it has a directly opposite effect in Louisiana. Moreover, the doctrine is tending to bring about interminable litigation. Passed 15 years ago, the Act has generated litigation that is not yet abating; we have another dispute similar to this one before us now, and neither the United States nor the State indicates that there is not far more time-consuming litigation still to come. In fact, discussion of this case by the Court requires 63 pages in what appears to me to be as succinct and clear an opinion as could have been written. And even yet the end of the dispute has not arrived. How many years the Master who must now be appointed will have to work, how many persons must be hired to help him, no one can predict. Settling and identifying boundaries on land is a surveyor's job; he must go to the land with his instruments and mark it off. Identifying an ocean boundary, we are told by the briefs and arguments of both parties here, is a much more complex job; it takes much time by surveyors, cartographers, photographers, and oceanographers, a knowledge of angles, tides, rolling waters, higher mathematics, etc.[9] Shorelines are constantly changing, and thus under the Court's formula even this painstaking work cannot provide a means of marking the boundary for all time. I cannot accept the argument that Congress ever intended to impose on this Court such an unjudicial job. I turn therefore to Lou-

---

[9] See my dissent filed today in the *Texas Boundary Case. Ante,* at 8, n. 2.

isiana's contentions that Congress long ago adopted a plan and selected a government agency to determine where the inland water line is, that this agency has considered and determined that line, marking it as required by law, and that this line, which is not movable but fixed, provides the stability and certainty necessary to make the purchase and exploitation of oil leases on submerged lands a commercial success. To the extent that my analysis is inconsistent with other possible interpretations of the second *California* case, it must be recognized that the usual reasons for strong deference to prior precedent are almost wholly absent here. *Stare decisis* is a valuable principle because by making the governing legal rules predictable, it enables private parties to determine their rights without litigation and enables lower courts to dispose of the great bulk of disputes that do result in litigation. In the present unique situation, however, only a small handful of parties is affected by the governing legal rule; settlement entirely out of court is highly unlikely under the Court's Convention rule; and in practice though not of necessity, cf. 28 U. S. C. § 1251 (b)(2), all these disputes are being brought within the original jurisdiction of this Court. Under these circumstances this Court should certainly not adhere blindly to its previous holdings, particularly where, as here, the State involved was not a party to the prior litigation and the claim raised here by Louisiana under the 1895 Act was never considered in the prior litigation.

## II.

In 1895 Congress passed this law:

"The Secretary of the Treasury is hereby authorized, empowered and directed from time to time to designate and define by suitable bearings or ranges with light houses, light vessels, buoys or coast objects,

the lines dividing the high seas from rivers, harbors and inland waters." [10]

This 1895 law was the successor of other laws showing congressional interest in marking the boundaries between inland and outer-sea waters.[11] Such marks are necessary in order for ships to know when they must obey local signals in the inland waters of a State, as distinguished from their duty to observe international rules and warnings. Title 33 of the U. S. Code contains our inland water rules, for infraction of which courts can inflict penalties consisting of fines and sometimes ship seizures. The Government argues that it is not the purpose of this statute to give the Secretary power to mark this boundary except to control navigation. To buttress this contention, reference is made to a few sporadic statements by Secretaries who had occasion to mark boundaries and by some legislators who helped pass the statute. But surely the Government is not contending that Congress in solemnly considering over a period of years and then passing this law was doing so as a kind of joke. International and local rules of navigation are serious business and the warnings put out under order of Congress to inform ships where inland waters begin must be acted on and obeyed. Here not only has the line delineating Louisiana's waters been marked but also the State passed Act 33 of 1954 accepting these governmental markings as showing positively and certainly just where its inland water line is located. And there is no danger that this line will be ambulatory since the line is now marked, and will not move as shore conditions

---

[10] 28 Stat. 672. This Act has been changed by substituting for the Secretary of the Treasury the Secretary of Commerce, and later by placing the responsibility with the Commandant of the Coast Guard. Now 33 U. S. C. § 151.

[11] E. g., 23 Stat. 438 (1885); 26 Stat. 320 (1890).

change.   Nor will future modifications in the line by the
Coast Guard disrupt title to these inland waters or to
the land and oil beneath them since this Court has
repeated several times that a State's territory cannot
be taken away from it by Congress without its consent.[12]
Such was the understanding of Senator Cordon, floor
manager for the Submerged Lands Act, who said:

> "The boundaries of the States cannot be changed
> by Congress without the consent of the States.   We
> cannot do anything legislatively in that field, and
> we have not sought to do so in this measure." [13]

Acceptance of the Coast Guard's inland water mark for
Louisiana fits precisely within the reasons given for utiliz-
ing the international Convention in the second *California*
case.   It will put a stop to eternal litigation and help
relieve this Court of the heavy burden repeatedly brought
upon us to make decisions none of us have the time or
competence to make.   It will release the time of the
Court to do other and more important things.   It will
help to end further delay in our giving effect to the
desire of Congress to grant the States full ownership
and control over submerged lands three miles or three
leagues from their coastlines.   And it will provide the
certainty and stability which are absolutely essential for
useful development of our off-shore oil resources.
   I dissent from the Court's holding.

---

[12] See, *e. g., Fort Leavenworth R. Co.* v. *Lowe,* 114 U. S. 525,
541 (1885); *Geofroy* v. *Riggs,* 133 U. S. 258, 267 (1890).
   [13] 99 Cong. Rec. 2634.