**JUPITER CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

and

**Tennessee Gas Pipeline Company, Intervening Respondent.**

No. 89–3498.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1990.

Decided Sept. 4, 1991.

Rehearing Denied Sept. 25, 1991.

Calvin Sawyier, Winston & Strawn, Howard W. Carroll (argued), Carroll & Sain, Chicago, Ill., for Jupiter Corp.

Timm Abendroth (argued), F.E.R.C., Washington, D.C., Lawrence F. Coffill, F.E.R.C., Chicago, Ill., Terrence J. Collins, Tennessee Gas Pipeline Co., Houston, Tex., for F.E.R.C.

David E. Williams, Tennessee Gas Pipeline Co., Houston, Tex., for Tennessee Gas Pipeline Co.

Before CUMMINGS, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Jupiter Corporation bought natural gas from producers in Louisiana and sold it to Tennessee Gas Pipeline Company. Tennessee Pipeline sold the natural gas to wholesale customers who in turn sold it to consumers. In 1958, the state of Louisiana adopted a severance tax to be paid by Louisiana gas producers. To cover the Louisiana severance tax, the producers requested authority from the Federal Power Commission (FPC) (predecessor to the Federal Energy Regulatory Commission (FERC)) to raise their rates to Jupiter. Jupiter filed for a corresponding increase in its rates to Tennessee Pipeline and received authority to increase its rates to accommodate the severance tax. However, Louisiana apparently anticipated there might be trouble with the legality of this tax, which covered offshore wells more than three miles from its coastline, because the state never actually levied the tax on the natural gas producers.

Nonetheless, for almost seven years Jupiter included the severance tax in the rates it collected from Tennessee Pipeline, who in turn collected it from their wholesale customers, who then collected it from consumers. But because the producers who supplied Jupiter were not required by Louisiana to pay the severance tax, the producers never requested Jupiter to pay the increased rates. The severance tax revenue of some two to three million dollars received by Jupiter through its increased rates from 1958 to 1965 was treated by Jupiter as income and used for its operations. In effect the tax was collected by Jupiter from the consumers and ended up in Jupiter's coffers.

In 1966, Jupiter applied for a "permanent certificate of public convenience and necessity" to replace a temporary certificate it held authorizing it to sell natural gas to

Tennessee Pipeline. This application was given FPC Docket No. G–16679. As a part of the investigation of the rates and charges of Jupiter, the FPC discovered that Jupiter was collecting rates which included the severance tax which was never levied.

After this was brought to light, Jupiter proposed to the FPC a settlement agreement which included, among other things, that Jupiter would receive a permanent certificate of public convenience and necessity—conditioned upon a requirement that it place in escrow an amount equal to two-thirds of the severance tax it received from 1958 through 1965. Jupiter would also contribute interest at a rate of 7% for the time it had control of the funds—the time collection began until the time the FPC acted on the Jupiter settlement proposal.

The FPC approved the settlement offer in June, 1966. The FPC stated in its order that acceptance of Jupiter's settlement offer would reduce Tennessee · Pipeline's transportation rate "without further litigation" with Jupiter; provide an "immediate settlement of the Louisiana severance tax issue"; terminate "all pending rate and certificate proceedings and court appeals involving Jupiter"; and give the "maximum benefits to the consumers through establishment of the lowest transportation rate, at which Jupiter claims its stockholders will be protected from severe financial loss and under which Jupiter can be preserved as an operating entity."

The order provided that a permanent certificate of public convenience and necessity be issued to Jupiter authorizing it to sell gas to Tennessee Pipeline. As a condition of the issuance of the permanent certificate, Jupiter established an escrow account with an initial deposit of $252,298 and continued to make monthly payments into the escrow account of $27,000 for 50 months. The order also stated that "[t]he amounts deposited in the escrow account, together with accumulated interest thereon shall be retained subject to further order [of the FPC] in Docket No. G–16679 directing disposition to the party or parties entitled thereto."

By 1970, the escrow account was fully funded with the amounts Jupiter was required to contribute. We are at a loss to know why, but the escrow account has remained in existence for nearly 23 years, earning interest at market rates which were at times much higher than rates when it was established in 1966. Jupiter continued to deal with the escrow agent, First National Bank of Chicago, on a yearly basis separately paying the annual fees for administration of the account.

In January 1989, when the amount in escrow had grown to over $9 million, Jupiter and Tennessee Pipeline jointly proposed a plan to the FERC for distribution of the escrow fund. Jupiter wrote a letter to the FERC indicating that "disputed monies" collected by it in its transactions with Tennessee Pipeline were being held in escrow pursuant to prior order of the FPC. The letter then stated that "Jupiter and Tennessee are desirous to dispose of this Docket" and outlined a procedure whereby the "Escrow Agent ... pay all monies [in the account] to Jupiter Industries, Inc.," and that "Jupiter Industries, Inc., pay instanter to Tennessee $1,901,398 in full satisfaction of Jupiter's obligation to Tennessee."

In the accompanying one-page double-spaced "Settlement Agreement," Jupiter cryptically set forth the following:

> Jupiter Industries, Inc. (successor to Jupiter Corporation), and Tennessee Gas Pipeline Company hereby entered into this Settlement Agreement concerning the money to be paid by Jupiter to Tennessee upon issuance of such further order by the Commission. **Tennessee has no objection to the settlement whereby the escrow shall be forwarded to Jupiter Industries, and that Jupiter Industries shall pay to Tennessee the sum of One Million Nine Hundred One Thousand Three Hundred Ninety Eight ($1,901,398.00) Dollars.**

> By this settlement Tennessee agrees to waive any claim Tennessee might have to retain any of the escrow money to be paid by Jupiter, and Tennessee agrees to pass on such refunds to its customers by

crediting such amounts to its Unrecovered Purchased Gas Cost Account.

Tennessee's agreement in this regard is subject to a final non-appealable order of the Commission (1) specifying the amount to be paid by Jupiter to Tennessee in satisfaction of Jupiter's escrow obligation; (2) limiting Tennessee's refund liability to its customers to the amounts specified to be paid by Jupiter to Tennessee; and (3) approving the flow through to Tennessee's customers of the amounts received by Tennessee by credit to Tennessee's Unrecovered Purchased Gas Cost Account.

Settlement Agreement dated January 6, 1989 (emphasis added). Neither in its cover letter nor the settlement agreement submitted to the FERC did Jupiter mention that the amount in the escrow account as of January, 1989, was $9,104,290.31. More astonishingly, there was no mention that if the settlement agreement were accepted Jupiter would retain the balance of the escrow account in the sum of $7,202,892.31.

Jupiter did advise the FERC in its cover letter that "we would appreciate your expeditious scheduling of this agreed settlement and request for final order so as to finally dispose of this outstanding docket."

Two months later, in April of 1989, at FERC's request, Jupiter provided a more detailed memorandum outlining its prior position and stating that its objective is to "expeditiously recover the excess funds in the account in accordance with the 1966 Order," and acknowledging that the account held over $9 million.

Jupiter's plea to the FERC was for fairness. It indicated it wished to be treated as everyone else who charged their customers the severance tax which Louisiana never sought to enforce.

The FERC rejected Jupiter's proposed distribution of the escrow fund determining that Jupiter has no right to any of the money held in escrow. The FERC then ordered that all the funds held in escrow be paid to Tennessee Pipeline for flow through to Tennessee Pipeline's customers. The FERC allowed Jupiter to retain amounts for annual fees it had paid to the escrow agent for administering the escrow account.

Jupiter filed a petition for rehearing and clarification or modification. The FERC granted rehearing solely for the purpose of further consideration, and then denied the petition.

This petition for review was filed by Jupiter pursuant to 15 U.S.C. § 717r(b), which is § 19(b) of the Natural Gas Act. As we have previously noted, "our review of the FERC's orders 'is essentially narrow and circumscribed.'" *Northern Ind. Pub. Serv. Co. v. F.E.R.C.*, 782 F.2d 730, 739 (7th Cir.1986) (quoting *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 766, 88 S.Ct. 1344, 1359, 20 L.Ed.2d 312 (1967)). We afford deference to the FERC, given that they are an "expert body dealing regularly with natural gas supply contracts." *Amoco Prod. Co. v. F.E.R.C.*, 765 F.2d 686, 690 (7th Cir.1985). In light of this deference, we examine FERC decisions reached under the Natural Gas Act to make sure that they are "reasoned, principled, and based upon substantial record evidence." *Peoples Gas Light & Coke Co. v. F.E.R.C.*, 742 F.2d 1109, 1111 (7th Cir.1984). Here, however, even without this deferential standard of review our decision in the first instance would have been the same as the FERC.

In plain terms Jupiter proposes that it keep most of the $9 million in escrow because giving all that money to the consumers would be unfair to it. Language from its petition for rehearing before the FERC discloses its untenable position:

> It is clear that if Jupiter had not agreed to escrow the funds (as it did) and had instead retained the refund amounts, it would have paid interest on the refunds *only* at the Regulation rate, at most. That was the treatment that FERC accorded to all others that collected—and retained—the Louisiana severance tax. Jupiter should not be prejudiced because it settled and did *not* retain use of its refunds.

Pet. for Reh'g before the FERC at 2, filed June 21, 1989 (footnote omitted). This statement discloses Jupiter's fundamental

rationale: Jupiter voluntarily entered into a settlement of the FPC regulatory proceedings in 1966 and the provisions of that settlement agreement proved to be less favorable than the settlement provisions the FERC afforded others in 1982. Jupiter now seeks to avoid the consequences of their voluntary acts in settling the regulatory proceedings by saying "it's just not fair."

The fact is that in 1966, to secure a permanent certificate of public convenience and necessity for authority to sell and deliver to Tennessee Pipeline the gas which Jupiter purchased from an offshore producer, Jupiter voluntarily agreed to place funds in escrow and allow the FPC to distribute those funds to "the party or parties entitled thereto." There is no doubt that Jupiter was not a party "entitled" to the funds held in escrow. The funds were to be paid either to the gas producers who supplied Jupiter, if Louisiana was constitutionally entitled to levy the tax, or to the customers of Tennessee Pipeline, if the severance tax was found to be invalid. As a result of a United States Supreme Court decision, Louisiana was found to be without authority to impose a severance tax on natural gas wells located more than three miles off its shore. *See, e.g., United States v. Louisiana,* 394 U.S. 11, 89 S.Ct. 773, 22 L.Ed.2d 44 (1969). The beneficiaries of the escrow account were therefore Tennessee Pipeline and ultimately its customers.

It makes no difference that other sellers of natural gas who increased their rates to cover the Louisiana severance tax achieved a more favorable result than did Jupiter. Pursuant to the settlement it freely negotiated, Jupiter has no legal interest in the escrowed funds or their disposition. Perhaps because it maintained contact with the escrow account for so long, Jupiter continues to view the escrow fund as its own. For example, Jupiter contends that it should not be required "to refund more interest than it would have been required to refund if it had held and used the funds." The fact is that Jupiter's refunding efforts were completed when the escrow account was fully funded. To obtain a permanent certificate of public convenience and necessity Jupiter paid into escrow a percentage of the severance tax it collected—money that did not belong to Jupiter. That the escrow account has grown over the 23 years to $9 million does not increase the amount Jupiter paid for distribution. The extensive delay in ordering distribution of the escrow fund has no impact on Jupiter simply because it was never entitled to receive any of the funds in escrow.

The nature of the settlement adopted by the FPC as its order in 1966 indicates that once Jupiter funded the escrow account, its liability was fixed. The agreement provided for accumulated interest to be distributed, along with the principal amount in the account. The FERC did not err in determining that this meant that any and all interest that the escrowed funds earned during the intervening period would be included in the phrase "all accumulated interest." Jupiter's own action in 1966 placed all of the escrow fund—now a tantalizing $9 million—outside Jupiter's grasp. The FERC's decision to deny Jupiter's proposed settlement was correct.

For the foregoing reasons, the order of the Federal Energy Regulatory Commission is ENFORCED.